STATE OF CONNECTICUT *v.* CHARLES MARSH

HOUSE, C. J., LOISELLE, MACDONALD, BOGDANSKI and LONGO, Js.

Argued March 5—decision released June 3, 1975

*Anthony V. DeMayo,* public defender, for the appellant (defendant).

*Ernest J. Diette, Jr.,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Robert K. Walsh,* assistant state's attorney, for the appellee (state).

LOISELLE, J. The defendant, Charles Marsh, after a jury trial, was found guilty of four counts of sale of a narcotic drug in violation of § 19-480 (a) of the General Statutes. He has appealed from the judg-

ment. Of the assignments of error made only two are briefed. All other claims are considered to have been abandoned. *State* v. *Lally,* 167 Conn. 601, 605, 356 A.2d 897; *State* v. *Brown,* 163 Conn. 52, 55, 301 A.2d 547.

The first assignment of error is that the court failed to permit defense counsel to ask questions designed to determine the existence of bias or prejudice. Specifically, the defendant, who is black, claims that his questioning of veniremen with respect to race prejudice was unduly restricted. He does not claim that all questioning related to racial bias was refused but that not enough questioning was permitted, even though some of the questions were indelicate and even though some may have made jurors uncomfortable by having them bare their innermost sentiments. It is his further claim that the only discernible common denominator of the disallowed questions is that they called for an opinion and a potentially embarrassing response, and that the court avoided discomfort for the prospective jurors at the expense of the constitutionally guaranteed right to a fair trial of the defendant.

Section 19 of article first of the constitution of Connecticut, as amended by article IV, states in part as follows: "The right of trial by jury shall remain inviolate . . . . In civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate." In conducting the examination of jurors during voir dire, the trial court is vested with wide discretion; *State* v. *Clark,* 164 Conn. 224, 226, 319 A.2d 398; *Childs* v. *Blesso,* 158 Conn. 389,

394, 260 A.2d 582; *Sherman* v. *William M. Ryan & Sons, Inc.,* 126 Conn. 574, 578, 13 A.2d 134; and when questioning by counsel transcends the proper limits of the voir dire and represents an abuse of the right of examination, the court is under a duty to restrict such examination. *State* v. *Mendill,* 141 Conn. 360, 362, 106 A.2d 178; *Duffy* v. *Carroll,* 137 Conn. 51, 57, 75 A.2d 33.

The discretion of the court as to the questions to be asked of the jurors on voir dire examination is subject to the essential demands of fairness as required by the due process clause of the fourteenth amendment to the constitution of the United States. *Ham* v. *South Carolina,* 409 U.S. 524, 526, 93 S. Ct. 848, 35 L. Ed. 2d 46; *Aldridge* v. *United States,* 283 U.S. 308, 310, 51 S. Ct. 470, 75 L. Ed. 1054. Discrimination on the basis of race is a subject which in the examination of jurors the court must allow if requested by a party. *Ham* v. *South Carolina,* supra.[1] In *State* v. *Higgs,* 143 Conn. 138, 143–44, 120 A.2d 152, this court stated that "[w]e cannot be blind to the fact that there may still be some who are biased against the Negro race," and quoting the *Aldridge* case as authority held that it was an abuse of discretion and error for the court to exclude all questions to veniremen concerning race prejudice. Our state, by constitutional provision,

[1] The Supreme Judicial Court of Massachusetts has ruled that such examination is required only if the defendant is a "special target for racial prejudice." *Commonwealth* v. *Ross,* 363 Mass. 665, 672, 296 N.E.2d 810. Without deciding the correctness of this construction a majority of the United States Court of Appeals for the First Circuit upheld the granting of the defendant's habeas petition by the district court under the facts of the case which involved a black defendant charged with committing a violent act upon a white security officer. *Ross* v. *Ristaino,* 508 F.2d 754 (1st Cir.).

allows the questioning of each prospective juror individually by counsel, and, within that framework, counsel is entitled to interrogate on the subject of race prejudice. This right, however, is not unlimited. As stated in *State* v. *Van Valkenburg,* 160 Conn. 171, 173, 276 A.2d 888, both court and counsel should be alert to a duty to avoid a perversion of the constitutional right accorded to litigants in their determination of the makeup of a jury. Counsel is not entitled to ask questions on the subject of race prejudice in unlimited numbers or in any particular form, and the questions must not be irrelevant or vexatious. Further, the court may restrict the questions to those that are general but "sufficient to focus the attention of prospective jurors on any racial prejudice they might entertain." *Ham* v. *South Carolina,* supra, 527, 533.

With these principles in mind, the record, briefs and appendices are examined to determine whether the court, in limiting the examinations, did abuse its discretion. It may be noted that the voir dire lasted approximately five days, that thirty-nine prospective jurors were examined and that approximately 390 pages of the 496 page voir dire transcript represent the interrogations by counsel for the defendant. The portion of the record devoted to the questioning of veniremen covers the examination of ten prospective jurors upon which the defendant claims that the court's rulings were unduly restrictive. The examination of these ten jurors on the subject of race prejudice as set forth in the record are substantially as follows:

Venireman I: The prospective juror was told that the defendant was a black man, and she stated that it did not make any difference to her. She was

asked if she had black neighbors, and she replied that she had two. She was asked how she felt about black people, and she answered that they were human beings. She was asked if she had any unfortunate or unpleasant experiences with black people, and she replied in the negative. She was asked if she ever moved out of a neighborhood because black people moved in, and she replied, "No." This last answer was allowed to stand even though an objection to it was sustained. The only question asked by the defendant which was refused was, "Do you think that as part of your duty as being a juror, you would be able to put yourself in this man's shoes to the extent of understanding or making a real effort to understand what life is like for a black man in a ghetto in a city in the United States?"

Venireman II: To the questions of defense counsel, he answered that there were black members in the Masons but not in his lodge nor in the V.F.W. post where he belonged. He stated that he was employed with black people, that he did not have black neighbors, that he had not moved from one neighborhood into another because black people moved in, and that he did not have any close friends or acquaintances who were black. The only questions to which the court sustained an objection were, "Can you tell us, in your own words, how you feel about black people?" and "Based on having lived around this area for a long time, do you have an opinion as to whether or not in this geographical area, black people have an equal chance with whites?" Thereafter, he was asked if it would be more difficult for him to be fair if all witnesses brought in by the police were white considering that the defendant was black, and the answer was, "No, sir." The next question was, "Do you think

that the fact that he is black, taken by itself, would cause it to be for you, in any way, more difficult to be utterly fair with him than if he were white?" and the answer was, "No, sir."

Venireman III: Having stated that he had sat on a criminal case before, this prospective juror was asked if the defendant in that case was black or white. He answered that the defendant was white. In answer to other questions of defense counsel he stated that it would not be difficult for him to be fair in deciding the case considering that the defendant was black or that all the witnesses against him would be white. The court sustained an objection to the question, "Could you tell us, in your own words, how you feel about black people?" Thereafter, the venireman stated in answer to a question by counsel for the defendant that he had not moved out of a neighborhood because black people had moved in. There was an objection to this last question asked, the court ruled that the answer would stand, and counsel for the defendant stated that the answer was "more than satisfactory" as far as he was concerned. Thereafter, the venireman answered that he had not read, seen television, or had any thoughts about life in black ghettos in our cities. He was then asked in some detail if he could put himself in the defendant's shoes and understand his point of view, not having any experience or having done any reading concerning what life is like in black ghettos in our cities. An objection to that question was sustained.

The conduct of the examination of the seven remaining veniremen was in the same vein and did not differ substantially from those above recited. They are presented in a footnote to avoid making

the opinion unduly lengthy.[2] Ordinarily the recital of questions and answers in such detail would not be made, but as the issue involved was one of constitutional dimensions, it was felt that a complete picture should be presented. While it is difficult to understand the objection and the sustaining of the objection to the question of how a venireman feels

[2] Venireman IV: Defense counsel asked this prospective juror whether he had done any reading, or seen anything on television, about life in black ghettos in our cities, and he responded affirmatively. He was then asked, "Do you have any particular feelings about that, sir?" An objection was sustained, but immediately after this ruling the juror was asked, "Has any of what you have read along these lines made any particular impression on you?" He answered, "No, sir." Later he was asked, "Can you tell us, in your own words, how you feel about black people, sir?" An objection to this question was sustained. Immediately thereafter he was asked whether, considering the fact that the defendant was a black man, there was any possibility that it would be a little bit more difficult to be completely fair. The answer was, "I happen to run the Little League connected to the Police Academy on Sherman Avenue, and that Little League consists of about eighty percent black. I train these boys, and I have no difficulty." An objection was sustained to the question of whether he would say "that the black people in this city have been treated the same by the police as white people in general." The venireman was later asked if he had black neighbors, and he replied that he did, and to a further question answered that he had not had any unpleasant or unfortunate experiences with black people.

Venireman V: The one question concerning racial prejudice put to this juror was whether the fact that the defendant was a black man and all witnesses against him were white would cause him, in any way, to have difficulty in being "utterly fair" in deciding the case. The answer was, "I don't think so."

Venireman VI: There was no objection to or exclusion of defense counsel's questions except for the question, "Have you any feelings concerning the kind of life that black people in the ghettos have to live?" The other questions and answers relating to the defendant's being black and the venireman's not being affected by this fact and to his having had no unpleasant experiences with black people were allowed by the court.

Venireman VII: The prospective juror stated that he lived next door to black people when he moved into a particular neighborhood, that it is now rundown, and that the fact that the defendant

about a black person, it can hardly be said, in the light of the questions and answers allowed by the trial court, that there was a significant restraint on the defendant in his effort to uncover any racial prejudice among the veniremen. Inquiry was allowed to determine any prejudice which each pro-

was black would not make it difficult for him to be fair to him. Objection was sustained to the question as to his impression of what life is like in black ghetto areas like his former neighborhood in New Haven.

Venireman VIII: Defense counsel's questions regarding what life was like in the black ghettos in our cities were excluded. The venireman then stated that he had black neighbors, that he had black coworkers, and that he saw black people socially. The court sustained objections to the questions, "Can you tell us generally how you feel about black people?" and "Have you ever done any reading about the way police behave in the black neighborhoods of our cities?"

Venireman IX: The court sustained the objections to questions regarding the prospective juror's impression as to life in black ghettos and to a question concerning her feelings about black people. She did state, "I have no objection against the black race. I think they are human beings." And to the question, "Do you think that there is any possibility at all that it would be, in any degree, however slight, more difficult for you to be totally fair with Mr. Marsh, considering that he is a black man?" she replied, "I don't think that would enter in it." She further stated that the fact that all the witnesses against the defendant were white would not make any difference to her in any degree. She also stated she had black neighbors but they did not have time to socialize.

Venireman X: The court sustained the objection to a question about his opinion concerning life in black ghettos of the cities. He then stated that he would not be influenced in any degree, "however subtle," in deciding the case by the fact that the defendant was black or that all the witnesses against him were white. He stated he had had black neighbors. When he was asked if he ever changed his residence because of the fact that black people were moving into his neighborhood, the objection to that question was sustained. Objection was also sustained to the question which asked in part if he would be able, "at least in listening to the defendant's side of it, to try to put yourself in his shoes, in the sense of understanding the kind of life he comes from and the way the mind of a man, who has lived his life in a black ghetto, naturally works?"

spective juror might have against the defendant because of his race. It is clear from the narration of the questioning of the veniremen that the court did not abuse its discretion in its conduct of the voir dire. In fact, in reviewing the record and in just lifting the transcript of the voir dire, it is evident that the court was extremely liberal in the latitude afforded defense counsel in questioning veniremen. *State* v. *Clark,* 164 Conn. 224, 226, 319 A.2d 398. To this court's knowledge and as demonstrated in this case, no state in the union, nor any court in the federal system, is more liberal in the conduct of a voir dire than this state.

The second assignment of error briefed by the defendant is that he was denied a fair trial in violation of the Connecticut and United States constitutions by virtue of the admission into evidence of a toxicological report which the defendant had not been permitted to see or copy.

On September 14, 1970, counsel for the defendant filed a motion for discovery and inspection. The written motion included the following: "Pursuant to Section 54-86a of the Connecticut General Statutes, Sections 168 and 468 of the Practice Book, Article 1, Section 8, of the Connecticut Constitution, and the Sixth and Fourteenth Amendments to the United States Constitution, the Defendant respectfully moves . . . to inspect and copy or photograph the following: . . . 4. The results or reports of any and all tests and experiments . . . ." The motion was granted in part and denied in part, with the requests in section 4 being denied by the court. The statute as it existed at that time and the sections to the Practice Book mentioned in the motion did not mandate compliance, especially where there

was no showing that such would be of assistance in the defense of the action. The constitutional requirement of due process relative to discovery is well expressed in such cases as *Giles* v. *Maryland,* 386 U.S. 66, 87 S. Ct. 793, 17 L. Ed. 2d 737; *Miller* v. *Pate,* 386 U.S. 1, 87 S. Ct. 785, 17 L. Ed. 2d 690; *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215. "The heart of the holding in the *Brady* case is the prosecution's suppression of evidence in the face of a defense production request where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression, (b) evidence favorable to the defense and (c) materiality. These are the standards by which the prosecution's conduct is to be measured. *Moore* v. *Illinois,* 408 U.S. 786, 794, 795, 92 S. Ct. 2562, 33 L. Ed. 2d 706." *State* v. *Moynahan,* 164 Conn. 560, 593, 325 A.2d 199. There is no showing that there was any constitutional violation of these standards.

It is now claimed that even though trial counsel, who is not appeal counsel, did not know of the existence of § 19-483 (b) of the General Statutes at the time he made the motion for discovery, he was entitled to the toxicological report by virtue of that statute as it existed at that time.[3] The short answer

---

[3] General Statutes (Sup. 1969) § 19-483 (b) stated as follows:

"The chief toxicologist shall establish the standards for analytical tests to be conducted with respect to controlled drugs, or with respect to blood or urine believed to contain alcohol, by qualified professional toxicologists and chemists operating at his direction and shall have the general responsibility for supervising such analytical personnel in the performance of such tests. The original report of an analysis made by such analytical personnel of the state department of health shall be signed and dated by the analyst actually conducting the test and shall state the nature of the analytical test or procedure, the identification and number of samples tested and the results of each analytical test. Such report

to this argument is that the motion was not made pursuant to that statute.

During the course of the trial, the state chief toxicologist testified on direct examination, and three exhibits containing a combination of heroin and quinine were entered into evidence. On cross-examination of the chief toxicologist the defendant moved that the exhibits and the testimony of the toxicologist be stricken as he had not signed the reports of the toxicological tests himself and had no independent recollection of the tests. Thereafter, the state offered the reports of the tests under General Statutes § 19-483 (b) as it existed at that time. Objection was made, one of the grounds being that § 19-483 (b) states that "[s]uch report shall be available to counsel for the defendant upon request" but that his motion for a copy of the test was denied the previous September. The court allowed the reports in evidence and the defendant duly excepted.

As previously stated, the motion for discovery made prior to trial specifically stated under what authority such requests were made, and the motion

shall be available to counsel for the defendant upon request and shall be received in any court of this state as competent evidence of the matters and facts therein contained upon introduction through the testimony of any toxicologist of the state department of health as to the nature of the tests performed, the controls employed to ensure the accuracy of the test results and the competence of any analyst of the state department of health performing such test at his direction and under his supervision."

The last sentence was amended in part by 1971 Public Acts, No. 164, as follows:

"A copy of such report certified by the analyst shall be received in any court of this state as competent evidence of the matters and facts therein contained at any hearing in probable cause, pretrial hearing or trial. If such copy is to be offered in evidence at a trial, the attorney for the state shall send a copy thereof, by certified mail, to the attorney of the defendant . . . ."

cannot be read to include a request under § 19-483 (b). The court cannot be deemed to have erred by not complying with § 19-483 (b) when it made its ruling upon the motion as specifically drawn by the defendant, and nowhere in the record is it shown that the court was alerted that the defendant would be entitled to the reports of the tests under § 19-483 (b). See *DuBose* v. *Carabetta,* 161 Conn. 254, 264–65, 287 A.2d 357; *Cohn* v. *Dunn,* 111 Conn. 342, 349, 149 A. 851; *Welbrot* v. *Levenberg,* 98 Conn. 217, 225, 118 A. 911. On appeal a party is not entitled to take advantage of a statute that is not mandatory in nature when he discovers its existence after a court has ruled against him on the grounds presented at the time the ruling was made. Consequently, the trial court was not in error in overruling the defendant's objection to the admissibility of the reports based upon the ground that he had previously requested the reports of the tests. Further, the statute as it existed at the time of trial did not make the competency of the reports as evidence contingent upon their being made available to the defendant upon request, that is, the turning over of the reports prior to trial was not a sine qua non of their being introduced into evidence.

There is no error.

In this opinion the other judges concurred.