## STATE OF CONNECTICUT *v.* SEAN SMITH
### (14209)

SHEA, GLASS, COVELLO, BORDEN and BERDON, Js.

Argued December 5, 1991—decision released May 5, 1992

*Francis T. Mandanici,* assistant public defender, with whom, on the brief, were *Brian S. Carlow* and *Erskine D. McIntosh,* assistant public defenders, and *Daniel E. Dilzer,* certified legal intern, for the appellant (defendant).

*James A. Killen,* assistant state's attorney, with whom were *Michael Dearington,* state's attorney, and *Elpedio Vitale,* assistant state's attorney, for the appellee (state).

SHEA, J. The defendant, Sean Smith, appeals from a murder conviction[1] claiming that the trial court improperly: (1) prohibited certain voir dire questions

---

[1] The defendant was sentenced to forty years imprisonment after being convicted of murder in violation of General Statutes § 53a-54a (a), which provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

regarding racial prejudice and predisposition to convict; (2) allowed the state to exercise peremptory challenges to excuse two black venirepersons; (3) prohibited the defense from introducing certain evidence concerning the violent proclivities of the victim; and (4) gave the jury an incomplete "Chip Smith" charge. We affirm the judgment.

The jury could reasonably have found the following facts. In February, 1990, the victim, Darrell Brantley, made an arrangement with Devonya Inman whereby Inman permitted him to sell drugs out of her apartment in Meriden in exchange for money and drugs. During the same month, the defendant moved into Inman's apartment and began working for the victim selling drugs there. One or two months later, the victim and the defendant had a dispute over drug money, which culminated in an incident in which the victim and his friends beat the defendant on the head with a pot. After that conflict the defendant entered into his own agreement with Inman to sell drugs from her apartment, and the victim's previous arrangement with her terminated. Although no longer on friendly terms, the victim and the defendant did meet on occasion without incident.

On April 17, 1990, at approximately 10 p.m., the defendant was standing on the porch of Inman's apartment when he observed the victim in the driveway selling drugs. He angrily shouted to the victim to move out of the driveway, to which the victim responded, "Well, why don't you move me?" The defendant then entered the apartment where he began pacing and telling his girlfriend that he was tired of the victim "messing with" him. He then retrieved his rifle from a closet and returned to the porch, where he told the victim, "I'm going to move you." The victim, who had his hand in his coat as though concealing a weapon, turned to run from the defendant, according to the state's evidence. According to the defendant, the victim had

reached inside his coat for a weapon.[2] The defendant fired one bullet that struck the victim's shoulder and another that hit him in the back. These injuries proved fatal. The jury found the defendant guilty of murder.

## I

## A

During voir dire defense counsel asked the first prospective juror, a white person, a series of questions designed to discover any possible racial prejudice he might harbor against the defendant, a black person. In the course of that questioning, defense counsel asked, "How would you feel if a relative of yours, son, daughter, brother or sister . . . expressed an intent to you that he wanted to marry a black person?" The state objected on grounds of relevancy, and the trial court sustained the objection. Defense counsel took exception to the ruling. When questioning the next venireperson, defense counsel did not ask the prohibited question, but pointed out that he had not done so because he "gathered your Honor would sustain the objection." The court responded that it would have again disallowed the question and would do so if defense counsel asked it of any other prospective juror. Defense counsel then registered a continuing objection.

Although the trial court forbade defense counsel from asking the question about interracial marriage, it allowed him to ask the venirepersons many other questions aimed at uncovering bigotry. These included whether they worked with black people; whether they

---

[2] It is unclear from the evidence adduced at trial whether the victim actually had a weapon inside his coat. One witness gave a signed statement to the police, in which she stated that she had seen someone remove a gun from the victim's body after he had been shot. At trial, however, the witness denied having seen a gun removed. Her signed statement was admitted into evidence as a prior inconsistent statement, and the jury was instructed that it could consider the statement for its substantive truth.

had black superiors at work; whether they had ever been passed over for a promotion in favor of a black person due to a racial quota system; whether they had friends and neighbors who were black; whether they ever had black people as social guests in their homes; whether they ever had lunch with black people; whether they had had any negative experiences with black people; whether they had ever formed an opinion about a situation based on the race of the people involved; whether their attitudes about race had changed; whether they had a subconscious bias against black people; whether they had ever hesitated to do something with someone because that person was black; whether they felt that black people have been given too many advantages that they do not deserve; and whether they had any general feelings about black people. The trial court remarked to defense counsel, after explaining that it would not allow the interracial marriage question, "you've already asked five times as many questions dealing with the race of the defendant, five times more questions than I have ever heard any defense counsel in any case ever ask before. So, I think you've gone quite far in your questioning on the effect the race of the defendant has on the prospective jurors."

The defendant acknowledges that he was allowed to probe extensively into the prospective jurors' attitudes about race. He maintains, however, that the trial court's exclusion of the interracial marriage question was an abuse of its discretion that resulted in the deprivation of his state and federal constitutional rights because that question, unlike any other he had asked, was a "litmus test" for racial bias. He claims that the answer to that one question would have given "a better picture of the juror than the answers to a thousand other bland questions on race." Even if answers to this question would have been as illuminating as the defendant claims, we decline to find error in the trial court's

exclusion of the question because the multitude of other questions pertaining to potential racial prejudice that defense counsel was permitted to ask provided a sufficient basis for discovering any racial bias that might have tainted members of the venire. Cf. *State* v. *Jones,* 205 Conn. 638, 669–70, 534 A.2d 1199 (1987).

"The right to a voir dire examination of each prospective juror in a criminal action is provided by § 54-82f of the General Statutes. This right was established as a constitutional one in 1972 by including in article IV of the amendments to the state constitution the provision that '[t]he right to question each juror individually by counsel shall be inviolate.' " *State* v. *Hill,* 196 Conn. 667, 671, 495 A.2d 699 (1985).[3] "This right, however, is not unlimited . . . . *Counsel is not entitled to ask questions on the subject of race prejudice in unlimited numbers or in any particular form,* and the questions must not be irrelevant or vexatious." (Citations omitted; emphasis added.) *State* v. *Marsh,* 168 Conn. 520, 523, 362 A.2d 523 (1975). Subject to these principles, the trial court is vested with broad discretion to determine the extent of the voir dire examination. *State* v. *Hernandez,* 204 Conn. 377, 381, 528 A.2d 794 (1987); *State* v. *Dolphin,* 203 Conn. 506, 511–12, 525 A.2d 509 (1987). We therefore will not disturb its rulings in this regard unless the court has clearly abused its discretion such that prejudice to one of the parties

---

[3] Voir dire examination must also meet minimum standards of fairness as required by the due process clause of the fourteenth amendment to the United States constitution. *Ham* v. *South Carolina,* 409 U.S. 524, 526, 93 S. Ct. 848, 35 L. Ed. 2d 46 (1972); *Aldridge* v. *United States,* 283 U.S. 308, 310, 51 S. Ct. 470, 75 L. Ed. 1054 (1931). In *Ham,* the court held that voir dire interrogation designed to elicit possible prejudice against black persons on the part of prospective jurors must be permitted, but that "the trial judge was not required to put the question in any particular form, or to ask any particular number of questions on the subject, simply because [it was] requested to do so by petitioner." *Ham* v. *South Carolina,* supra, 527.

has resulted. *State* v. *Dahlgren,* 200 Conn. 586, 601, 512 A.2d 906 (1986); *State* v. *Rogers,* 197 Conn. 314, 318, 497 A.2d 387 (1985).

Although we believe that the question on interracial marriage was relevant[4] in that it might have revealed subconscious racism on the part of a prospective juror, we do not look at that question in isolation to determine whether the defendant's claim has merit. Instead, we assess the claim in the context of the entire voir dire to determine whether the defendant was afforded a sufficient opportunity to expose racist attitudes among the prospective jurors. *State* v. *Fritz,* 204 Conn. 156, 162, 527 A.2d 1157 (1987). As noted previously, defense counsel was allowed to ask each prospective juror a host of questions about race, some of which could be said to test the existence of subconscious as well as overt prejudice. See *State* v. *Dolphin,* supra, 512. In view of the far-reaching inquiry on race conducted by defense counsel, we do not believe that the exclusion of the question on interracial marriage significantly hampered the defendant's right to inquire about potential racial prejudice among the venirepersons.

## B

During voir dire, the state was examining a prospective juror who had expressed indecision about his ability to return a verdict. After the state had asked him a number of questions, the trial court interjected to inquire whether, after hearing all the evidence in the case and deliberating with the other jurors, he would have any difficulty in finding the defendant guilty, if the state had proved his guilt or, conversely, in acquit-

---

[4] " '[T]his court is authorized to rely upon alternative grounds supported by the record to sustain a judgment.' " *Latimer* v. *Administrator,* 216 Conn. 237, 252, 579 A.2d 497 (1990); *Kelley* v. *Bonney,* 221 Conn. 549, 592, 606 A.2d 693 (1992).

ting him, if the state had not. The venireperson responded in the negative. When the court asked whether he would find it easier to do one than the other, he replied that he would have to listen to the case. After further questioning, this prospective juror indicated that he might have a harder time convicting than acquitting. The court then asked, "Would it be easier for you to find somebody not guilty than to find somebody guilty?" He said it would not, the questioning ceased and the state then exercised a peremptory challenge to excuse him.

While questioning the next prospective juror, defense counsel asked, "Do you feel that after you have heard all the evidence et cetera, and you are weighing the case that you might find it easier to reach a verdict of guilty compared to not guilty?" When the person expressed confusion about the question, defense counsel rephrased it as follows, "Do you feel as a human being that . . . after you have heard the case . . . you will be more inclined to find a person guilty as compared to not guilty?" The state objected, and the trial court sustained the objection, stating that defense counsel had to relate the conclusion of guilt or innocence to the evidence in the case. Defense counsel argued that his question was the same as that asked by the court of a previous venireperson. The court then interjected, asking the prospective juror whether he would have any difficulty finding the defendant guilty if the state had proved his guilt or not guilty if the state had not proved his guilt. He responded that he would not.[5] The defendant later exercised a peremptory challenge to excuse this person.

During examination of another venireperson, the court sustained the state's objection to the following

---

[5] The court also asked, "Depending on which way you called it, would you have any hesitation doing either one?" The prospective juror responded negatively.

question by defense counsel: "I'm asking as I mentioned your gut reaction . . . . Do you feel that you'd be more inclined to find a defendant guilty or not guilty?" The court again emphasized to defense counsel that he must frame the question in such a way as to relate it to the evidence in the case. The court went on to suggest a way of formulating the question that was consistent with how it had questioned other prospective jurors on the same topic.

The defendant claims that he was deprived of certain constitutional rights[6] when the court prohibited him from asking questions aimed at discovering whether anyone in the venire had a predisposition to convict. This claim has no merit. Although the trial court sustained objections to the form of certain questions regarding predisposition to convict, it afforded defense counsel ample opportunity to rephrase the questions to ascertain the desired information. In fact, the court itself questioned prospective jurors about any inclination they might have had to decide the case one way or the other and even suggested to defense counsel how he might frame a question to explore this important area. Consequently, there was no meaningful restriction of defense counsel's inquiry into a venireperson's predisposition to convict and thus no basis for claiming reversible error.[7] See *State* v. *Fritz*, supra, 161; *State* v. *Rogers*, supra.

---

[6] Specifically, he claims that the court's action deprived him of his federal and state constitutional rights to due process and to a fair and impartial jury. See Conn. Const., art. I, § 8, as amended; U.S. Const., amends. V, VI and XIV.

[7] We note also that, in determining whether members of the venire were predisposed to convict his client, defense counsel also could have considered the answers he had received to questions about the presumption of innocence and the state's burden of proof beyond a reasonable doubt, which the trial court did not restrict in any way. See *State* v. *Pollitt*, 205 Conn. 61, 75, 530 A.2d 155 (1987).

## II

The defendant next claims that the trial court committed constitutional error when it allowed the state to exercise peremptory challenges to excuse two black venirepersons, Carletta Fountain and Kenneth Lawrence. We are not persuaded that the court's ruling deprived the defendant of any constitutional right.

During jury selection, the state exercised peremptory challenges to excuse Fountain and Lawrence. Upon objection by the defendant, the trial court required the state to provide a racially neutral justification for its use of peremptory challenges to excuse them, in accordance with this court's mandate in *State* v. *Holloway,* 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). With respect to Fountain, the prosecutor explained that he was concerned that she would not be able to understand certain legal concepts, particularly the difference between a reasonable doubt and absolute certainty, and that she might harbor some ill will for the state, since she had once filed charges, which she later dropped, against her husband and had never spoken to a prosecutor while the charges were pending. With respect to Lawrence, the prosecutor explained that he was concerned that Lawrence might have difficulty in fairly assessing the credibility of police officers because he had had negative experiences with the police and had relatives who had been in trouble with the law. The court accepted these explanations and excused Fountain and Lawrence.

In *Batson* v. *Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury "raises constitutional questions of the utmost

seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." *State* v. *Gonzalez,* 206 Conn. 391, 394, 538 A.2d 210 (1988); see also *Swain* v. *Alabama,* 380 U.S. 202, 85 S. Ct. 824, 13 L. Ed. 2d 759 (1965). Once a criminal defendant asserts a *Batson* claim, the prosecution must "advance a neutral explanation for the venireperson's removal . . . . The defendant is then afforded the opportunity to demonstrate that the state's articulated reasons are insufficient or pretextual." *State* v. *Holloway,* supra, 641. " 'Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility' . . . a trial court's determination that there has or has not been intentional discrimination is 'entitled to appropriate deference' upon review on appeal." *State* v. *Gonzalez,* supra, 395, quoting *Batson* v. *Kentucky,* supra, 98 n.21.

We have identified several factors that may indicate that the state's excusal of a black venireperson through a peremptory challenge was racially motivated. These include: "(1) The reasons given for the challenge were not related to the trial of the case . . . (2) the prosecutor failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race as the challenged juror were not struck . . . (5) the prosecutor advanced 'an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically' . . . and (6) the prosecutor used a disproportionate number of peremptory challenges to exclude members of one race. . . ." (Citations omitted.) *State* v. *Gonzalez,* supra, 399. In view of these factors and all the relevant circumstances, we are not persuaded that the state engaged in purposeful racial discrimination when it excused Fountain and Lawrence.

The state's concern that Fountain had displayed a misunderstanding of and a questionable commitment to the prevailing standard of proof beyond a reasonable doubt, "if adequately substantiated, satisfies *Batson* because a prosecutor has a legitimate interest in obtaining jurors who will faithfully adhere to the governing burden of proof." *State* v. *Gonzalez*, supra, 404–405. The record indicates that when Fountain was first asked whether she had any difficulty with the idea that the state did not have to prove its case beyond "any and all doubt or to a mathematical certainty," she asked the prosecutor to restate the question. After the prosecutor reiterated that proof beyond a reasonable doubt is a lesser burden than proof beyond any and all possible doubt, she replied, "I think I am understanding that. I am trying to." When he attempted to explain the concept a third time, she responded, "I am not sure I understand." The foregoing exchange adequately substantiates the prosecutor's assertion that Fountain had difficulty in understanding legal concepts.

The defendant argues that the prosecutor's justification was a pretext, nonetheless, because he accepted two white jurors who had displayed confusion about the concept of circumstantial evidence. Without defining the term "circumstantial evidence," the prosecutor asked these people whether they could follow the court's instruction that circumstantial evidence was as good as direct evidence. Both white venirepersons expressed confusion about that term. After the prosecutor had explained the term, both prospective jurors stated that they would be able to follow the court's instruction in that regard. In contrast, Fountain expressed equivocation about the applicable quantum of proof, even after receiving further clarification of that standard.

The record also supports the state's contention that, because Fountain had received no communication from

the office of the state's attorney after she had made a complaint against her husband, she might have had misgivings about the professionalism of prosecutors generally. We note that the state asked Fountain a substantial number of questions and that they were similar to those asked of white venirepersons. Furthermore, the panel ultimately chosen contained three black jurors and one black alternate. Although the racial composition of the jury impaneled is certainly not dispositive of the issue, since "the striking of even one juror on the basis of race violates the equal protection clause, even when other jurors of the defendant's race were seated"; *State* v. *Gonzalez,* supra, 400; it is a factor that we must consider in assessing the prosecutor's explanation for striking Fountain. After scrutinizing the record with the various *Gonzalez* factors in mind, we conclude that the state did not inject racial discrimination into the voir dire process when it exercised a peremptory challenge to excuse Fountain.

We now review the record to determine whether the state's racially neutral explanation for its removal of Kenneth Lawrence is adequately substantiated. During the voir dire, Lawrence stated that the police had been "very professional" in recovering certain cars that had been stolen from his used car dealership. When the prosecutor asked Lawrence whether he had ever had any negative experience with the police, he replied, "I'm a black male, I live in the City of New Haven. Yes." Questioned further about this statement, Lawrence explained, "You get harassed and questions gets [sic] asked." He later stated that he had been arrested as well and that he had cousins who had been arrested, including a cousin who had been convicted and incarcerated one year earlier.

Lawrence's testimony about being harassed and arrested by the police substantiates the state's claim that it was seeking to remove Lawrence because he

might not be able to assess fairly the credibility of police officers who would be testifying in the case. Prosecutors commonly seek to exclude from juries all individuals, whatever their race, who have had negative encounters with the police because they fear that such people will be biased against the government. We decline to ascribe a racial animus to the state's excusal of a venireperson with an arrest record simply because that venireperson was black. We agree with courts in other jurisdictions that this concern constitutes a neutral ground for the state's exercise of a peremptory challenge to excuse a black venireperson. See, e.g., *State* v. *Thompson,* 516 So. 2d 349, 354 (La. 1987), cert. denied, 488 U.S. 871, 109 S. Ct. 180, 102 L. Ed. 2d 149 (1988); *State* v. *Moore,* 438 N.W.2d 101, 107 (Minn. 1989).[8]

The defendant contends that the state excused Lawrence not because he was potentially biased against the police, but because he lacked the usual bias in favor of the police. He cites Lawrence's testimony that he had also had positive encounters with the police, when they had recovered cars stolen from his dealership, and that, because he had had both pleasant and unpleasant experiences with the police, he felt he would be especially evenhanded in assessing their credibility. A venireperson's assessment of his own prejudices may be untrustworthy for a variety of reasons. For instance, he may be lying in an effort to be chosen for the jury, embarrassed to reveal unsavory truths publicly or sim-

---

[8] The defendant attacks the other ground articulated by the state, the fact that Lawrence's cousin had recently been convicted and incarcerated, claiming that allowing the exercise of a peremptory challenge on such a basis would be tantamount to allowing racial discrimination because of the statistical likelihood that a black venireperson would have a friend or relative who had been incarcerated. Because we have concluded that the state's concern about Lawrence's arrest record was a neutral ground for excusing him from the jury, which was adequately supported by the record, we need not address this other claim.

ply unaware of the existence of bias. Through subtle questioning and scrutiny of body language during the jury selection process, counsel may uncover subconscious prejudice even in the face of an outright denial of prejudice by the venireperson. See *State* v. *Higgs,* 143 Conn. 138, 142, 120 A.2d 152 (1956). Although Lawrence attested to his own fairness, the state was nonetheless entitled to focus on the fact of his arrest and his use of the word "harassed" to characterize his treatment by the police to excuse him on the ground that he might have been biased against police officers. Cognizant of our inability to consider Lawrence's credibility in the calculus on appeal, we give great deference to the ruling of the trial court in this regard. *Batson* v. *Kentucky,* supra, 98 n.21; *State* v. *Holloway,* supra, 641.

Our review of the voir dire in this case satisfies us that none of the *Gonzalez* factors indicating purposeful racial discrimination were present in the state's use of a peremptory challenge to excuse Lawrence. We therefore reject this claim of the defendant.

### III

The defendant next maintains that he was deprived of his right to present a defense, which is guaranteed by the state and federal constitutions, when the trial court prohibited him from introducing certain evidence related to the violent proclivities of the victim. Some background information is necessary to analyze this claim properly.

Before the defendant took the stand, defense counsel informed the trial court that he intended to elicit testimony that the defendant had heard about specific acts of violence committed by the victim against other people in order to establish that the defendant reasonably believed that his life was in danger when he shot the victim. The court ruled, over the state's objection,

that such evidence would be admissible, not for its substantive truth, but for the limited purpose of proving the defendant's state of mind. The defendant then testified that a man named Richard Gade had told him, before the shooting in question, that the victim had beaten him, Gade, "almost to death" with a tree stump. He further testified that he believed that the victim had been arrested for this attack on Gade and that the victim had admitted beating Gade.[9]

The defendant then informed the court that he would seek to elicit testimony from Officer Michael Silva of the Meriden police department that the victim had a reputation in the community for violence. The state did not object to the admission of such testimony. The defendant then expressed an intent to offer the long form information and arrest warrant issued as a result of the victim's alleged attack on Gade along with photographs of Gade taken shortly after the beating. The trial court allowed Silva to give his opinion that the victim was a very violent person and to state that the victim had a reputation in the community for being violent, but excluded the information, arrest warrant and photographs.[10]

Next the defendant sought to admit the testimony of a witness, Charles Barron, that he had had an altercation with the victim approximately two hours before the shooting, when the victim, under the influence of alcohol, hit Barron with a rock and a bicycle part and told him, "I'll kill you. I'll shoot you right here." The

---

[9] The defendant also testified about other violent actions of the victim that he had observed, about the victim's reputation as a violent person and about the defendant's personal belief that the victim was dangerous and always carried a gun.

[10] We do not discuss the trial court's exclusion of the photographs of Gade because the defendant has not briefed any legal claim with respect to that issue. See Practice Book § 4065; State v. Tatum, 219 Conn. 721, 742, 595 A.2d 322 (1991).

court allowed Barron to testify about the victim's use of alcohol that night, but not about the victim's violent acts.

On appeal the defendant argues that the information and arrest warrant issued as a result of the Gade beating should have been admitted as evidence of a specific act of violence by the victim since it tended to prove that the victim was the aggressor when the defendant shot him.[11] He advances the same claim with respect to the evidence of the victim's altercation with Barron shortly before the shooting. We conclude that the trial court correctly excluded the evidence of these specific acts of violence.

It has long been the law in this state that, in a homicide prosecution, "an accused may introduce evidence of the violent, dangerous or turbulent character of the victim to show that the accused had reason to fear serious harm, after laying a proper foundation by adducing evidence that he acted in self-defense and that he was aware of the victim's violent character." *State* v. *Miranda,* 176 Conn. 107, 109, 405 A.2d 622 (1978), citing *State* v. *Padula,* 106 Conn. 454, 456–57, 138 A. 456 (1927). More recently, we joined a majority of courts when we expanded this rule to allow the accused to introduce evidence of the victim's violent character to prove that the victim was the aggressor, regardless of whether such character evidence had been communicated to the accused prior to the homicide. *State* v. *Miranda,* supra. In *Miranda,* we determined that the victim's violent character could be proved "by reputation testimony, by opinion testimony, or by evidence of the deceased's convictions for crimes of violence,

---

[11] We do not consider the defendant's alternate claim that the information and arrest warrant were admissible for the limited purpose of proving the reasonableness of the defendant's belief that he was being threatened with deadly physical force or great bodily harm because that claim was never raised at trial. See Practice Book § 4185.

18

irrespective of whether the accused knew of the deceased's violent character or of the particular evidence adduced at the time of the death-dealing encounter." Id., 114. This court has not, however, departed from our precedent that specific violent acts not resulting in a criminal conviction may not be introduced to prove the victim's violent character. See *State* v. *Padula,* supra. We decline to do so now.

We conclude that the deceased's violent character may not be established by evidence of specific violent acts, other than convictions, "not because it is unconvincing but because it has the potential to surprise, to arouse prejudice, to multiply the issues and confuse the jury, and to prolong the trial." *State* v. *Miranda,* supra, 112; see also *State* v. *Padula,* supra. The federal rules of evidence,[12] along with a vast majority of courts in this country, prohibit the use of specific acts to prove character in this context. See 1A J. Wigmore, Evidence (4th Ed.) §§ 63, 63.1. Courts have cited the same concerns about inquiry into potentially confusing collateral matters; *State* v. *Johnson,* 219 N.W.2d 690, 695 (Iowa 1974); unfair surprise to the party against whom the evidence is offered; *Heffington* v. *State,* 41 Tex. Crim. 315, 320, 54 S.W. 755 (1899); and prejudice to the prosecution if the deceased is shown to have been a detestable person; *Henderson* v. *State,* 234 Ga. 827, 828, 218 S.E.2d 612 (1975) ("It is unlawful to murder a violent and ferocious person, just as it is unlawful to murder a nonviolent and inoffensive person.").

---

[12] Rule 405 of the Federal Rules of Evidence provides: "(a) Reputation or opinion.—In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. *On cross-examination,* inquiry is allowable into relevant specific instances of conduct.

"(b) *Specific instances of conduct.—In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense,* proof may also be made of specific instances of that person's conduct." (Emphasis added.)

In this state, convictions of violent crimes constitute a narrow exception to the general prohibition on evidence of specific acts to prove the violent character of a homicide victim, because the dangers of injecting collateral issues confusing to a jury and prolonging the trial are minimal when only convictions may be admitted.[13] Although the defendant contends that such dangers are also held to a minimum in the case of an information or arrest warrant, we are not persuaded. A conviction is indisputable evidence of the commission of a violent crime. On the contrary, a charging document is a mere accusation, not a settled disposition, and, as such, would invite dispute over collateral issues at trial. Similarly, an arrest warrant establishes nothing more than that a judge found probable cause to believe that a certain person committed a crime; this is a far cry from an adjudication that the person's guilt of a crime has been proven beyond a reasonable doubt. Such a fundamental distinction between a conviction, on the one hand, and an information or arrest warrant, on the other, justifies different treatment of the two kinds of evidence for purposes of proving character.

With respect to the testimony about the victim's alleged beating and threatening of Barron hours before the shooting in question, the defendant emphasizes the timing of the incident to argue that this specific act should have been admitted because it was nearly contemporaneous with the shooting at issue in the prosecution. Some courts have permitted evidence of specific acts of violence, unknown to the defendant, to be admitted if they are so connected in time, place and circum-

---

[13] Specifically, we noted "[t]hat a homicide victim has a record of violent crime should not come as a surprise to the prosecution. Nor is introduction of the victim's criminal record likely to confuse the jury and waste time, since the fact of the convictions is beyond dispute and inquiry must necessarily be limited to the time the events occurred and the nature of the conduct for which the victim was convicted." *State* v. *Miranda*, 176 Conn. 107, 113, 405 A.2d 622 (1978).

stances with the homicide that they are likely to assist the jury in characterizing the victim's conduct toward the defendant. See, e.g., *Mendez* v. *State,* 27 Ariz. 82, 87, 229 P. 1032 (1924); *State* v. *Beird,* 118 Iowa 474, 479, 92 N.W. 694 (1902); *State* v. *Waldron,* 71 W. Va. 1, 5, 75 S.E. 558 (1912). We need not decide now whether to adopt such a rule because we do not believe that evidence of the Barron incident was sufficiently connected to the homicide to warrant its admission, even if such a rule were in place. The defendant's offer of proof on this issue failed to establish any continuum between the deceased's alleged violence toward Barron and the events surrounding the homicide other than the possibility of the victim's continued drunkenness, about which Barron was allowed to testify. See *Henderson* v. *State,* supra (evidence of victim's drunken, violent conduct toward third party a few hours before incident excluded as not directly connected to incident); *People* v. *Perez,* 66 Mich. App. 685, 693, 239 N.W.2d 432 (1976) (evidence of victim's involvement in knife fight with third party the day before incident excluded as not directly connected to incident). Accordingly, we conclude that the trial court properly excluded evidence of the victim's alleged conduct toward Barron.

The defendant also maintains that the information filed after the Gade incident was independently admissible as a "judicial admission."[14] This claim requires little discussion. Professor Wigmore has explained: "The vital feature of a judicial admission is universally conceded to be its *conclusiveness* upon the party mak-

---

[14] The defendant also contends that the information should have been admitted as an "admission by a party opponent." Even if the information could have been construed as an admission by a party opponent, which we doubt, it was still properly excluded as a specific act of violence, not resulting in a conviction, offered to prove the victim's character. Although an admission by a party opponent is a recognized exception to the hearsay rule; *Hubbard* v. *Schlump,* 106 Conn. 216, 219, 137 A. 644 (1927); it is still subject to other evidentiary rules of exclusion.

ing it, i.e., the prohibition of any further dispute of the fact by him and of any use of evidence to disprove or contradict it. . . ." (Emphasis in original.) 9 J. Wigmore, supra, § 2590. "It is of the nature of [a judicial] admission, plainly, that it be by intention an act of waiver relating to the opponent's proof of the fact and not merely an assertion or concession made for some independent purpose." Id., § 2594. The information filed by the state concerning the Gade incident was far from conclusive proof that the victim had been the aggressor against the defendant, the fact in dispute in this homicide prosecution. Furthermore, the state certainly did not file the information against the victim with the intent of conceding the defendant's proof of self-defense in a subsequent murder case. "Moreover, in a criminal prosecution, the state is unlike a party to a civil action with respect to judicial admissions. This is so because the state is not an actor in the transaction or event giving rise to the prosecution as is a party to a civil action, but only exercises the public's power to vindicate its criminal laws." *State* v. *Rodriguez,* 180 Conn. 382, 397, 429 A.2d 919 (1980). For all these reasons, we conclude that the information was not a judicial admission by the state.

## IV

In his final claim on appeal, the defendant argues that the "Chip Smith" charge[15] given by the trial court to the jury violated his constitutional rights when, after instructing the jurors that they should reassess their positions in order to reach a unanimous verdict, the court failed to add that they were not compelled to reach a verdict if they could not come to an agree-

---

[15] This charge, which is designed to prevent a hung jury by encouraging jurors to attempt to reach a unanimous verdict, was first discussed in *State* v. *Smith,* 49 Conn. 376 (1881).

ment.[16] This claim was raised and rejected in the trial court. Although this court has approved the addition of similar cautionary language in a Chip Smith charge; *State* v. *O'Neill,* 200 Conn. 268, 283–84, 511 A.2d 321 (1986); we have never held it to be required. On the contrary, we have stated that a defendant is entitled only to "a jury unfettered by an order to decide," and not to "an instruction that a jury may 'hang.' " *State* v. *Ralls,* 167 Conn. 408, 422, 356 A.2d 147 (1974), overruled on other grounds, *State* v. *Rutan,* 194 Conn. 438, 479 A.2d 1209 (1984); *State* v. *Peary,* 176 Conn. 170, 184, 405 A.2d 626 (1978), cert. denied, 441 U.S. 966, 99 S. Ct. 2417, 60 L. Ed. 2d 1072 (1979). In this case, the trial judge stated at the outset that he was giving the supplemental instruction "in the *hope* that that will bring about a verdict." (Emphasis added.) In conclusion he asked the jurors to "return to the jury room and *discuss this case further.*" (Emphasis added.) This instruction and the language of the Chip Smith charge given convince us that the jury was never commanded to reach a verdict or led to believe that, despite actual disagreement, it was obliged to return a unanimous verdict. The opening clause of the standard charge cautions that "the verdict to which each juror agrees must,

[16] The trial court instructed the jury as follows: "Although the verdict to which each juror agrees must, of course, be his own conclusion, and not a mere acquiescence in the conclusions of the others, in order to bring minds to a unanimous result, you should, in conferring together, pay proper respect to each other's opinions and listen with candor to each other's arguments. If much the larger number of the panel are for a particular verdict, a dissenting juror should consider why his own conclusion is one which makes no impression upon the minds of the others who are equally honest and intelligent, and who have heard the same evidence with the equal desire to arrive at the truth, and under the sanction of the same oath. The minority ought seriously to ask themselves whether they may not reasonably doubt the conclusion of a judgment which is not concurred in by most of those with whom they are associated and distrust the weight or sufficiency of that evidence which fails to carry in the minds of their fellow jurors. I would ask you to return to the jury room and discuss this case further. You may retire."

of course, be his own conclusion, and not a mere acquiescence in the conclusions of others." Accordingly, we conclude that the standard Chip Smith charge given did not abridge the defendant's constitutional rights and we decline to engraft onto such a charge a constitutional requirement that the trial court inform the jury that it need not reach a verdict.

The judgment is affirmed.

In this opinion GLASS, COVELLO and BORDEN, JS., concurred.

BERDON, J., dissenting. During voir dire, the defendant, Sean Smith, a black man charged with murder, attempted to ask a venireperson the following question: "How would you feel if a relative of yours, son, daughter, brother or sister . . . expressed an intent to you that he [or she] wanted to marry a black person?" The state objected to the question on the ground that it was irrelevant, and the trial court sustained the state's objection. I agree with the majority that the question on interracial marriage was, in fact, relevant and should have been allowed because it might have revealed latent racism.[1] I do not, however, agree with the majority's dismissal of the defendant's claim on the basis that it was within the trial court's discretion to disallow this question.

Early on, the United States Supreme Court made clear that questions aimed at disclosing prejudice "of a serious character" must be allowed by the trial court. *Aldridge* v. *United States*, 283 U.S. 308, 313, 51 S. Ct. 470, 75 L. Ed. 1054 (1931). Subsequently, the court unanimously held that, to assure a black defendant a fair trial, the fourteenth amendment requires that the

---

[1] See discussion, infra, on New York Times article that examines how reaction to interracial marriages by whites may reveal latent prejudices against blacks.

defendant be allowed to question prospective jurors to determine whether they are racially prejudiced. *Ham* v. *South Carolina,* 409 U.S. 524, 527, 93 S. Ct. 848, 35 L. Ed. 2d 46 (1973). In *Ham,* Justice Marshall reminded us "that the right to an impartial jury carries with it the concomitant right to take reasonable steps designed to insure that the jury is impartial. A variety of techniques is available to serve this end . . . but perhaps the most important of these is the jury challenge. . . . Indeed, the first Mr. Justice Harlan, speaking for a unanimous Court, thought that the right to challenge was 'one of the most important of the rights secured to the accused' and that '[a]ny system for the empanelling of a jury that [prevents] or embarrasses the full, unrestricted exercise by the accused of that right, must be condemned.' . . . Of course, the right to challenge has little meaning if it is unaccompanied by the right to ask relevant questions on voir dire upon which the challenge for cause can be predicated. . . . It is for this reason that the Court has held that '[p]reservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury' . . . and that the Court has reversed criminal convictions when the right to query on voir dire has been unreasonably infringed." (Citations omitted.) Id., 532–33 (Marshall, J., concurring in part and dissenting in part.)

Our own state constitution affords even greater protection by providing: "In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily. . . . The right to question each juror individually by counsel shall be inviolate."[2]

---

[2] The fourth amendment to the Connecticut constitution provides: "Section 19 of article first of the constitution is amended to read as follows:

"The right of trial by jury shall remain inviolate, the number of such jurors, which shall not be less than six, to be established by law; but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. In all civil and criminal actions tried by a jury, the parties

Conn. Const., amend IV. The constitutional right to the individual voir dire is bolstered by General Statutes § 54-82f, which provides, in part: "In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action . . . ."[3] "Discrimination on the basis of race is a subject which in the examination of jurors the court must allow if requested by a party. . . . '[W]e cannot be blind to the fact that there may still be some who are biased against the Negro race' . . . ." (Citations omitted.) *State* v. *Marsh,* 168 Conn. 520, 522, 362 A.2d 523 (1975). Therefore, under our state constitution and § 54-82f, the accused enjoys the right to question each prospective juror individually on racial prejudice.

In view of federal and state constitutional law and § 54-82f, and the majority's recognition that the interracial marriage question was a relevant question to ferret out racial prejudice, I am unable to understand the majority's conclusion that forbidding the question was within the discretion of the trial court. The majority apparently supports this conclusion on the basis that the trial court allowed the defendant to ask the

---

shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate."

  [3] General Statutes § 54-82f provides: "In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties thereto. If the judge before whom the examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel, or in the action, as the judge determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of said action."

venirepersons a "multitude of other questions pertaining to potential racial prejudice . . . ." A review of the transcript, however, reveals that the trial court did not, in fact, consider the interracial marriage question to be cumulative. Before asking this question, the defendant asked only seven short prior questions, all of which laid a foundation for the interracial marriage question.[4] *After* the trial court disallowed the interracial marriage question, it allowed the defendant to ask the prospective juror seven *additional* questions relative to race.[5]

---

[4] See fotenote 5, infra.

[5] The questions asked of the venireperson on race were as follows:

"[Defense Counsel:] Now, the next area I want to get into with you is somewhat of an awkward area, it concerns race. It concerns that fact that Sean Smith is black and the job of any lawyer is to get into the issue of possible bias and prejudice of a juror, subconscious as well as conscious. That's our job. It's awkward. Do you work with any black people?

"[Venireperson:] Yes, I do.

"Q. Do you have any black supervisors?

"A. Currently, no.

"Q. Have you ever been involved in a situation where there were quotas and things of that nature, where maybe a black has been promoted over you because of some type of a quota system?

"A. No.

"Q. Do you have any friends that are blacks, to one degree or another?

"A. Acquaintances, yeah.

"Q. Do you have lunch with them? Maybe you don't have lunch with any people.

"A. I usually don't go to lunch. I work with people daily, black people daily.

"Q. Have you ever had, that you could think of, any negative experiences with black people that somehow might affect you?

"A. No.

"Q. Either at school, work, any type of situation?

"A. No.

"Q. Now, the next area is again very awkward. It's a sensitive area. How would you feel if a relative of yours, son, daughter, brother or sister—

"Mr. Vitale [State's Attorney]: I object to this question.

"The Court: Finish the question.

By Mr. Mandanici:

"Q. —expressed an intent to you that he wanted to marry a black person?

It is clear to me that the trial court disallowed the interracial marriage question, not because the defendant had an ample opportunity to explore this sensitive area, but exclusively on the basis that the question was not relevant, which, of course, is contrary to the opinion of this court. Notwithstanding this, the majority affirms the trial court's ruling on the basis of the "broad

"Mr. Vitale: I object [to] that as completely irrelevant.
"The Court: Have you finished your question?
"Mr. Mandanici: Yes, your Honor.
"The Court: Objection sustained.
"Mr. Mandanici: May I have an exception, your Honor?
"The Court: Yes.
By Mr. Mandanici:
"Q. Do you feel blacks are different in any way?
"A. Other than color of skin, no.
"Q. Right, other than color of skin. Can you foresee any situation where you would look at a black person and make a decision that would be different or having a feeling about that person merely because they're black?
"A. I would try not to. I mean, many people have underlying prejudices.
"Q. Subconscious?
"A. Right.
"Q. That's exactly what I'm trying to get at. Do you know of any situation where in your life where you had an idea, an opinion, about a situation that was based on the fact that this person was a black person, the person you're dealing with?
"A. I'm sure in my younger days I wasn't as educated or as aware as I am now. I imagine I was probably more apt to be prejudiced at that time. Nothing in particular, just a general way I grew up or neighborhood or whatever.
"Q. What would cause concern for any lawyer, if this was a close case, what would cause any lawyer's concern is the fact that there is some subconscious bias or prejudice you have against blacks that might be the thing that subconsciously tips the scales. Have you ever had, do you recall a situation where you made a decision where possibly that decision was based on the fact that the person was black?
"A. No.
"Q. Do you feel over the years you've become more aware of your own subconscious feelings?
"A. Yes.
"Q. Would you in this case at the end of the case sort of make a checklist and see whether in fact possibly those earlier feelings you had in your life might affect you in this case, do you think you would be able to do that?
"A. Yes."

discretion" with which the trial court is vested in determining the extent of the voir dire examination. One case that the majority cites espousing this proposition is *State* v. *Dolphin,* 203 Conn. 506, 511–12, 525 A.2d 509 (1987). In *Dolphin,* the trial court refused to allow either counsel to question individually the venirepersons on whether they would give more or less credibility to a police officer's testimony solely on the basis of his or her occupation. Although acknowledging the abuse of discretion standard of review, the court in *Dolphin* reversed the trial court and ordered a new trial because "[t]he exercise of the [trial] court's discretion, however, must be tempered to comport with the goals of the voir dire examination. . . . '[T]he court should grant such latitude as is reasonably necessary to fairly accomplish the purposes of the voir dire. *Clearly, therefore, if there is any likelihood that some prejudice is in the juror's mind which will even subconsciously affect his decision of that case, the party who may be adversely affected should be permitted questions designed to uncover that prejudice.* This is particularly true with reference to the defendant in the criminal case.' *State* v. *Higgs,* [143 Conn. 138, 142, 120 A.2d 152 (1956)]." (Emphasis added.) *State* v. *Dolphin,* supra, 512. In the present case, the trial court's ruling was even more egregious because the question the defendant sought to ask was aimed at uncovering racial prejudice, something that cannot be tolerated in a juror.

Furthermore, the trial court compounded the harm of its improper ruling because it made the ruling prospective.[6] So, even if it was the only question defense counsel asked, the trial court would not have

---

[6] The following colloquy occurred between defense counsel and the trial court during voir dire of the next venireperson:

"Mr. Mandanici: Your Honor . . . my question I didn't ask this juror that I asked the first prospective juror about the son or daughter marrying a black, I gathered your Honor would sustain the objection.

allowed it. In *Higgs,* this court found that the trial court's exclusion of questions on racial prejudice was not harmless, as the state had contended, because by the trial court's "repeated rulings excluding this line of questions and by its admonition of counsel, the court made it clear that it would not tolerate the propounding of such questions to any of the [venirepersons]. Consequently, the defendant was precluded from following this line of inquiry with all of the jurors who were selected to serve." *State* v. *Higgs,* supra, 144.

What is also troubling to me is the majority's implicit conclusion that the trial court may substitute its judgment for that of counsel by disallowing a relevant voir dire question, as long as the court allows other questions pertaining to the same subject matter. That, however, improperly injects the trial judge into an area constitutionally reserved for the state's attorney and the defendant and his or her counsel. Allowing trial courts to intrude on counsels' terrain frustrates both the immediate purposes of individual voir dire and the ultimate goal of achieving a fair and impartial jury. Examination of jurors on voir dire has a twofold purpose; it permits the trial court to determine whether the prospective juror is qualified to serve and it aids the parties in exercising their rights to peremptory challenges. *State* v. *Dolphin,* supra, 512. Although the defendant is not entitled to ask an unlimited number of questions on the topic, if the question is relevant, it seems to me that it must be allowed or, at least, not be banned for all upcoming venirepersons as the trial court did in this case.[7]

---

"The Court: That's correct.

"Mr. Mandanici: And if I asked any other jurors your Honor's ruling would be the same.

"The Court: That's correct. . . .

"Mr. Mandanici: Might I have a continuing objection?"

[7] Furthermore, the defendant's claim must be reviewed from the perspective that the evidence against the defendant was weak. The jury first reported that: "We are unable to reach a unanimous decision on the mur-

Racial prejudice and bigotry unfortunately are still prevalent in our society and they are facts to which we cannot close our eyes and pretend that they do not exist. It is, at times, hard to detect. It would be a rare instance indeed where a person would, on voir dire, admit in front of a judge and counsel that he or she is prejudiced in answer to a direct question. Counsel must be allowed to make inquiry through indirect questions that are aimed at revealing latent prejudice. Although a negative response to the interracial marriage question would not necessarily be a per se indication of racial prejudice, the answer to such a question would reveal information that would allow counsel for the party to explore adequately the subject. "Only then could [the defendant] intelligently challenge for cause or exercise his right of peremptory challenge." *State v. Rogers,* 197 Conn. 314, 319, 497 A.2d 387 (1985).

The importance of allowing such a question is underscored by a recent article in the New York Times. The article reported that, according to the General Social Survey,[8] "66 percent of whites said they would oppose a close relative's marrying a black person" and that 20 percent of white persons "still believe interracial marriage should be illegal." New York Times, Dec. 2, 1991, at A1, B6, col. 1. Doctor Richard D. Alba, chairman of the sociology department at the State University of New York at Albany, and a specialist in ethnic intermarriage and race relations, stated in the New

---

der charge. Do we move to manslaughter one at this point?" The trial court answered that they could deliberate on the charges in any sequence they wished. On the following day, the jury sent another note to the court: "The jury is unable to reach a unanimous decision. No further progress is anticipated." Shortly after the court read its version of the Chip Smith charge; *State v. Smith,* 49 Conn. 376, 386 (1881); the jury returned a verdict of guilty of murder.

[8] The General Social Survey is an annual polling of 1500 American adults of all races directed by Dr. Tom W. Smith, a researcher on social issues at the National Opinion Research Center at the University of Chicago. New York Times, Dec. 2, 1991, at A1, B6, col. 1.

York Times article that a white person's view on interracial marriage " 'is like the tip of the iceberg' . . . . 'It is the visible expression of a host of attitudes and informal contacts that are otherwise hard to measure. Whites have difficulty accepting blacks as neighbors and co-workers, and all the more as members of the family.' " Id.

Even if we were somehow able to assure that blacks would be represented on the jury in the same proportion as those in the community,[9] blacks are still a minority. Fairness, and the perception of fairness, require that black defendants be given great latitude in uncovering racial bigotry. Unfortunately, "[r]acial prejudice is a cultural malady that has shaped our history as a nation. It is a cancer of the mind and spirit which breeds as prolifically in the industrial cities of the North as in the rural towns of the South." *Ross* v. *Massachusetts,* 414 U.S. 1080, 1085, 94 S. Ct. 599, 38 L. Ed. 2d 486 (1973) (Marshall, J., dissenting from denial of certiorari). Our courts must be sensitive to the problem of racial bigotry that may exist in the administration of our judicial system; otherwise our courts will not be courts of justice. Surely, the majority's ruling today does not enhance this sensitivity.

Although I have not commented on the remaining issues presented in this appeal, I do not wish to imply that I concur with the majority on these issues. I do not address the remaining issues because I would find that the defendant's conviction should be reversed on this issue and that the case should be remanded for a new trial. Accordingly, I dissent.

---

[9] Of course, the composition of the individual jury panel drawn from the jury array amounts to "the luck of the draw." *State* v. *Tillman,* 220 Conn. 487, 510, 600 A.2d 738 (1991) (*Berdon, J.,* dissenting).