# STATE OF CONNECTICUT *v.* FRANCISCO RODRIGUEZ (11449)

DUPONT, C. J., and O'CONNELL and LANDAU, Js.

Argued January 18—decision released April 25, 1995

*John R. Williams,* with whom, on the brief, was *David B. Bachman,* for the appellant (defendant).

*Richard F. Jacobson,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Linda Howe,* assistant state's attorney for the appellee (state).

DUPONT, C. J. The defendant appeals from a judgment of conviction of robbery in the first degree rendered after a jury trial. The defendant claims that the trial court improperly (1) overruled his *Batson* challenges to the prosecution's exercise of its peremptory challenges, (2) denied the defendant access to police internal affairs files concerning allegations of misconduct by prosecution witnesses for use in cross-examination, (3) refused to declare a mistrial after the state attempted to introduce irrelevant and prejudicial evidence of the defendant's prior arrest record, and (4) violated the defendant's right to due process of law in its instruction to the jury as to the definition of proof beyond a reasonable doubt.[1] We affirm the conviction.

---

[1] The defendant makes other claims, such as the impropriety of the disclosure of his hospital records from the night of his arrest, to which he objects on the grounds of patient-doctor confidentiality, the inclusion on the jury panel of a juror who had had a prior confrontation with one of the police officers testifying for the prosecution, the state's challenge for cause to remove an African-American woman on the stated ground that a member of her family had once been the victim of mistaken identity, and the introduction of or reference by prosecution witnesses to evidence the defendant claims is irrelevant and prejudicial, such as a crack vial and a stained bulletproof vest.

These claims, although mentioned in the defendant's brief, are not adequately briefed. Such claims are deemed abandoned and will not be reviewed. *Fromer* v. *Freedom of Information Commission,* 36 Conn. App. 155, 156, 649 A.2d 540 (1994); *Mulholland* v. *Mulholland,* 31 Conn. App. 214, 215 n.1, 624 A.2d 379 (1993), aff'd, 229 Conn. 643, 643 A.2d 46 (1994).

Certain facts are relevant to this appeal. On the evening of February 7, 1991, Mark Krzos, a student at the University of New Haven, parked his 1991 GMC Jimmy (a four-wheel drive vehicle) in a parking lot behind his West Haven apartment building. The next morning, Krzos discovered that the vehicle had been stolen. When the vehicle was recovered, Krzos claimed that he did not own any of the various items the police officers found in the vehicle, including bowling equipment and an empty vial of crack cocaine.

That same evening, Edward J. Malvey III went to Nutmeg Lanes in Fairfield to participate in his weekly bowling league. He arrived at the bowling alley at approximately 9 p.m. He was unable to locate a parking spot near the bowling alley and parked his car in the dimly lit rear parking lot of the shopping center near the bowling alley. At approximately midnight, Malvey returned to his car with his bowling equipment. The shopping center had closed and the parking lot was fairly dark, although there was some lighting from store lights. As Malvey was placing his bowling equipment into his car, he observed a GMC Jimmy coming from the far end of the parking lot. The Jimmy stopped about twenty feet from his car. A passenger stepped out of the Jimmy and walked toward Malvey, saying "hold it right there, motherf__r." He kept his right hand behind his body, leading Malvey to believe that he had a weapon.

The stranger took Malvey's car keys and frisked him. When Malvey asked if he was being robbed, the stranger answered in the affirmative. Malvey gave the stranger his wallet. The stranger told Malvey to lie on the ground. Malvey noted that he had a silver automatic gun. The stranger began to search Malvey's car. As Malvey lay on the ground, a second stranger got out of the Jimmy, approached him, and unsuccessfully attempted to remove Malvey's wedding ring. Malvey

then heard a gunshot. After he heard the shot, Malvey noticed that the first stranger was limping and appeared to have sustained an injury to his left leg. The men took Malvey's bowling balls and threw them and some other objects into the Jimmy. The two men then left the parking lot in the Jimmy. Malvey noted that the Jimmy was going toward Bridgeport. He also noted the vehicle's registration number. It was later determined that the vehicle was the one that had been stolen from Krzos.

Malvey reported the incident to the manager of the bowling alley, who called the police. Malvey was unable to give a detailed description of the perpetrators due to the poor lighting in the parking lot. At trial, Malvey testified that the assailant who first accosted him was approximately five feet eight or nine inches tall, darker than he, weighing between 150 and 160 pounds, and wearing dark clothing. He was shown no mug shots or photographs. At trial, one of the responding officers testified that Malvey described both his assailants as black men. The defendant and the state agree that the defendant is Hispanic. The police found a .22 caliber shell casing near Malvey's car. The morning following the crime, Malvey was called to the Fairfield police station to identify his bowling ball, car keys and wallet. Five dollars had been removed from the wallet.

At about 12:40 a.m. on the night of the crime, Officer Angelo Pierce of the Bridgeport police department observed a GMC Jimmy parked on Pequonnock Street with the interior lights on and the motor running. Two men, one of whom was the defendant, were standing on the passenger side. When the men saw Pierce, they immediately separated and began walking away. Pierce saw the second man, later identified as Victor Garcia, throw a wallet into the grass as he walked away. Pierce stopped Garcia for "suspicious activity." Pierce then noticed a brown Buick Riviera parked near the Jimmy.

He retrieved the wallet, which contained photo identification indicating that it belonged to a Malvey. Pierce arrested Garcia. He concluded that the Jimmy was stolen because the door lock was "punched," the steering column was heavily damaged and "gutted," and the vehicle was running without a key in the ignition. The Jimmy matched the description and registration number given by Malvey of the vehicle his assailants were driving.

Pierce also noted that initially, as he was stopping Garcia, the defendant walked over to the Riviera and sat down. When Pierce approached the defendant and attempted to question him, Garcia began scuffling with the other police officers who had arrived, and Pierce turned to assist them. Pierce then transported Garcia to Bridgeport police headquarters for booking, and en route radioed all officers in the area to locate the brown Riviera and to detain the occupants. Once he received confirmation that this had been accomplished, he left Garcia at police headquarters and went to the location where the Riviera was stopped. There were two people in the Riviera. Pierce ordered both men out of the car and arrested the defendant for larceny of the Jimmy. When he emerged from the Riviera, the defendant stumbled and almost fell, apparently from a leg injury. The car was being driven by and was registered to a man who gave his name as Edwin Rodriguez. The defendant told Pierce his name was Heriberto Rodriguez. Another officer, however, testified that the defendant gave his name at the scene of the arrest as Roberto and an address of 105 Milne Street. Pierce noticed, but did not seize, dark colored clothing or rags in the back of the Riviera. When he and other officers later wanted to seize those items, they were unable to locate the vehicle.

The defendant was taken to the booking area at the Bridgeport police station, where he again gave his name

as Heriberto and this time gave his address as P.T. Barnum apartments. The defendant was later turned over to the Fairfield police, to whom he stated that his name was Heriberto. At no time did the defendant give his real name, Francisco. In addition, he offered different dates of birth throughout the arrest and booking procedures. Because of the defendant's leg injury, which was a bullet wound, an ambulance was summoned and he was transported to Park City Hospital for treatment.

The Jimmy was brought to a garage. When it was inspected by a member of the Fairfield police department, he seized, among other items, two bowling balls, a bowling ball insert, an empty crack vial, and a stained bullet proof vest.[2]

The defendant was charged with the crimes of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2),[3] larceny in the first degree in violation of General Statutes §§ 53a-119[4] and 53a-122 (a) (3),[5] and criminal impersonation in violation of General Statutes § 53a-130 (a). The charge of criminal impersonation was not pursued in a substitute information filed by the state.

The defendant began trial with Garcia as a codefendant. The defendant's motions to sever the trials were initially denied. After jury selection had been completed

---

[2] It is unclear from the record whether the vest was stained with blood or some other material.

[3] General Statutes § 53a-134 (a) provides in pertinent part: "A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime . . . (2) is armed with a deadly weapon . . . ."

[4] General Statutes § 53a-119 provides in pertinent part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

[5] General Statutes § 53a-122 (a) provides in pertinent part: "A person is guilty of larceny in the first degree when he commits larceny as defined in section 53a-119 and . . . (3) the property consists of a motor vehicle, the value of which exceeds ten thousand dollars . . . ."

and a suppression hearing held, however, the court reconsidered the motion to sever and granted it.[6]

At trial, the defendant's brother, Edwin Rodriguez, testified that the defendant was shot in the leg during an altercation earlier that evening. Edwin Rodriguez claimed that the defendant initially resisted being taken to the hospital because he was wanted for failure to appear in court on another matter and did not want to reveal his identity to hospital personnel. The two agreed to stop at Edwin Rodriguez' girlfriend's residence on Pequonnock Street to get identification for the defendant to use at the hospital. Edwin Rodriguez left the defendant waiting in the car and got the identification. He claimed that the two were en route to the hospital when they were stopped by the police.

The jury found the defendant guilty of robbery in the first degree and not guilty of larceny in the first degree and he was sentenced to serve a term of twenty years with a five year minimum mandatory sentence.

Other facts will be discussed as they pertain to particular issues in the case.

## I

### THE BATSON CLAIM

A state's exercise of peremptory challenges to exclude potential jurors on the basis of race or sex violates the equal protection clause of the United States constitution.[7] *Batson* v. *Kentucky*, 476 U.S. 79, 106 S.

---

[6] For our disposition of Garcia's appeal, see *State* v. *Garcia*, 37 Conn. App. 619, 657 A.2d 691 (1995). We note that there are minor discrepancies in the facts of these related opinions, irrelevant to our disposition of these cases, due to the different evidence and testimony presented at the two trials.

[7] In Massachussetts, which has a declaration of rights prohibiting bias in the exclusion of members of a discrete community group from a jury, it has been held that the declaration applies to a challenge by an Irish Catholic defendant to the use of peremptory challenges to exclude venirepersons of a discrete ethnic group, Irish Americans, where the fact of ethnicity is based on an "Irish sounding" surname. *Commonwealth* v. *Caldwell*, 418 Mass. 777, 641 N.E.2d 1054 (1994).

Ct. 1712, 90 L. Ed. 2d 69 (1986); *Martins* v. *Connecticut Light & Power Co.*, 35 Conn. App. 212, 645 A.2d 557, cert. denied, 231 Conn. 915, 648 A.2d 154 (1994). "Although a prosecutor is ordinarily entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that [members of one race] as a group will be unable impartially to consider the State's case against [a defendant of the same race]." *Batson* v. *Kentucky*, supra, 89. *Batson* applies to cases in which the defendant is a member of a cognizable racial group and the venireperson who is the subject of a peremptory challenge is a member of the same racial group. *State* v. *Holloway*, 209 Conn. 636, 641, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989).

*Batson* establishes a three-step procedure for evaluating claims that a prosecutor has used peremptory challenges in a manner violative of the equal protection clause. *Batson* v. *Kentucky*, supra 476 U.S. 96–98. First, the defendant must make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of race. Id., 96–97. In Connecticut, however, this requirement has been abrogated, and the defendant need not make such a showing. *State* v. *Holloway*, supra, 209 Conn. 646. The second step becomes immediately operative. Id.

In the second step, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. *Batson* v. *Kentucky*, supra, 476 U.S. 97–98. "A neutral explanation . . . means an explanation based on something other than the race of the juror. . . . Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason

offered will be deemed race neutral." *Hernandez* v. *New York,* 500 U.S. 352, 360, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991). The prosecutor's explanation need not rise to the level necessary to justify exercise of a challenge for cause. *Batson* v. *Kentucky,* supra, 97. The prosecutor may not, however, rebut the defendant's prima facie case by stating merely that the peremptory challenge was exercised on the assumption or on intuitive judgment that the prospective juror would have been partial to the defendant because they were of the same race. Id. Moreover, "[i]f a prosecutor articulates a basis for a peremptory challenge that results in the disproportionate exclusion of members of a certain race, the trial judge may consider that fact as evidence that the prosecutor's stated reason constitutes a pretext for racial discrimination." *Hernandez* v. *New York,* supra, 363. The exercise of a peremptory challenge, however, will not be held unconstitutional solely because it results in a racially disproportionate jury. Id., 361.

The third step requires the defendant to show that the articulated reasons of the state are insufficient or merely pretextual. *Batson* v. *Kentucky,* supra, 476 U.S. 97–98. "While *Batson* does not address the problem of pretext, other courts have discussed the types of evidence that are salient to a showing of pretext." *State* v. *Gonzalez,* 206 Conn. 391, 398–99, 538 A.2d 210 (1988). These include but are not limited to the following: "(1) The reasons given for the challenge were not related to the trial of the case . . . (2) the prosecutor failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race as the challenged juror were not struck . . . (5) the prosecutor

advanced 'an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically' . . . and (6) the prosecutor used a disproportionate number of peremptory challenges to exclude members of one race." (Citations omitted.) Id., 399; see also *State* v. *Smith*, 222 Conn. 1, 11, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992).

The defendant's ultimate burden of proof is to show by a preponderance of the evidence that, but for the prosecutor's invidious purpose, the juror would not have been challenged. *State* v. *Gonzalez*, supra, 206 Conn. 399–400. The defendant, however, need not show that "the peremptory challenge of every juror of the defendant's race was due to an impermissible motive; rather, under *Batson*, the striking of even one juror on the basis of race violates the equal protection clause, even when other jurors of the defendant's race were seated and even when valid reasons for the striking of some of the jurors of the defendant's race were shown." Id., 400. A trial court's determination of whether the prosecutor's reasons were valid or purposefully discriminatory is entitled to great deference. Id., 406–407.

In this case, the voir dire extended over three days, and included the questioning of thirty-six venirepersons.[8] The jury panel finally selected was comprised of six jurors and two alternates. Of the six jurors, one stated that he was African-American and one stated that she was one-half Puerto Rican and one-half African-American. Four were Caucasian.

The defendant's *Batson* claim concerns the state's peremptory challenge of an African-American venireman, Edward Smith. Smith was the fourth venireperson to be the subject of voir dire and was questioned

---

[8] The record does not indicate the racial composition of the thirty-six venirepersons.

on the first day of the voir dire proceedings. The transcript shows that because several police officers were expected to testify, each prospective juror's experiences with police officers in general was a concern for all counsel. The defendant claims that the state misused its peremptory challenge to excuse Smith because later the same day it accepted a white juror who expressed opinions about the police similar to Smith's.

During voir dire, the state's attorney asked Smith if he had ever been in the position of taking a complaint to a police officer, either in a professional or personal capacity. Smith replied that on two separate occasions, a car of his had been stolen from his Bridgeport home, that he had reported the thefts to the police, and that one vehicle was recovered but one was not. The state's attorney did not ask him further questions concerning these contacts with the police.

Smith was then asked by the state about any "bad experiences" with police officers. He replied that he had never had any. The state's attorney then asked if there had ever been an occasion when he felt that a police officer had been rude or inattentive. Smith related that he had once observed what he perceived to be an officer's rude behavior toward a saleswoman in a donut shop. He opined that the officer, as a customer, was "rude" and showed "bad manners," and that he thought the officer's behavior was "strange." Upon further questioning, Smith indicated that while he might have difficulty remaining neutral if the particular officer he had seen behaving rudely were testifying, he would treat testimony of other police officers as he would the testimony of other witnesses.

The state exercised a peremptory challenge to excuse Smith. The defendant's counsel[9] questioned the excusal

---

[9] At this point, the trials of the two accused had not yet been severed. Any reference to defense counsel or the defendant's counsel applies only to counsel for the defendant in this case.

under *Batson*. In explaining its reasons for the exercise of the peremptory challenge, the state cited concern about Smith's experience with the "rude" police officer in the donut shop and how that experience might make Smith more inclined to believe any argument by the defense that the confusion over the defendant's identity on the night of the crime was a result of the overzealous behavior of the police as to the defendant's identity rather than any misrepresentations by the defendant.[10] The court ruled that the state had evidenced a race-neutral explanation for its exercise of the peremptory challenge, and that the articulated reasons were not pretextual.

The defense again raised its *Batson* challenge to Smith's excusal after the voir dire of Bruno Gallace, a white male. Gallace was the eighth venireperson to be questioned. In response to the state's attorney's questions regarding any experiences he had had filing complaints with the police, Gallace reported that, as a college student, he had been part of a group of students who were robbed, that his home had been robbed once, and that he had had material stolen from a work

---

[10] The prosecutor argued: "I would just indicate first off that . . . Mr. Smith is not of the race of either of the defendants. I am concerned in light of the fact that there is a Bridgeport officer or officers who will be testifying; that Mr. Smith did indicate that he had referred to the incident where he saw the officer acting rudely toward another person, and it apparently made enough of an impression that it stuck in his memory and he responded when I asked about . . . a negative impression . . . . I have some concern in light of [defense counsel's] remarks . . . concerning the fact that he's claiming the identity of his client was somehow the result of the officers insisting on his name being one thing when he says it's something else. That . . . the defense might bring the officer's conduct into question more than simply that of being an observer somehow bringing police conduct into question. And I have some concern that Mr. Smith, because of what he related, might be more amenable to believe that type of argument than someone who would regard an officer totally neutrally . . . . I don't want a juror who might be perhaps ever so slightly inclined—more inclined to accept that type of a thing than someone who has a neutral view of an officer."

site. Gallace claimed that none of those experiences would cause him to evaluate a police officer's testimony any differently than the testimony of any other witness, and that he had never had an experience during which he felt a police officer was being rude or inattentive.

In response to defense counsel's question about whether he had ever observed "a police officer, not break the law, but do something which you considered to be rude or in bad taste?" Gallace responded that he had. When asked to elaborate, Gallace said that he did not believe that the experience would affect his ability to judge the credibility of any police officers who might testify. He explained that when he was sixteen years old he committed a motor vehicle infraction and was pulled over by a police officer and was "would you call it, persuaded to behave myself. In other words, I was threatened." Gallace further described the officer as "a little bit harsh."

The state's attorney then asked the court for permission to question Gallace further. She asked Gallace whether, in light of what he had just told defense counsel, he would like to reconsider his negative answer to her inquiry as to whether he had ever had "a bad experience" with a police officer. Gallace replied: "Well, maybe I misread your question. Like a bad experience I—it didn't personally—I wasn't harmed or it didn't really scar me, but I just remembered that this officer did this and I didn't think it was—[defense counsel] used the term . . . 'rude' and I felt it was that. I wasn't harmed by that. It wasn't—the way you termed it, I felt like you were asking me, did anybody—did an officer ever do anything that really made an impression on me that's going to harm me. This was rude what he—the officer did, but it didn't affect me at all." Gallace assured the state that he would treat a testifying officer "like anybody else."

The state then asked Gallace if he had had other experiences since his motor vehicle infraction in which he felt that officers "were polite and did their job properly." Gallace replied in the affirmative, and described an incident with a friend in which their car had broken down. He reported that the responding officer "did more than he had to do . . . he brought us home even though he wasn't supposed [to] and it—I thought it was real nice." Gallace also told the state that when he reported the theft in his home, he felt that the responding officers "did their job."

Counsel for both of the defendants and the prosecutor accepted Gallace as a juror. The defendant's counsel then renewed his *Batson* claim, arguing that the acceptance of Gallace as a juror by the state conflicted with the reasons given for its excusal of Smith. The defendant, therefore, is using the state's voir dire of Gallace to bolster his *Batson* claim as to Smith.

The defendant's counsel asked the court to strike the entire panel and begin jury selection anew "in view of the obvious disparate treatment of the jurors by the state." At this point in the voir dire, two jurors, including Gallace, had been seated. The defendant's counsel argued that, not only were both Smith and Gallace witnesses to what they perceived to be rude conduct by the police officers, Gallace was a victim of it, and, therefore, the state's excusal of Smith and acceptance of Gallace constituted disparate treatment under *State* v. *Gonzalez*, supra, 206 Conn. 399, in that "persons with the same or similar characteristics but not the same race as the challenged juror were not struck." Counsel for Garcia concurred, and both the defendant and Garcia further requested that Smith be returned to the jury pool and seated as a juror.

The state's attorney claimed that the peremptory challenge was based on race-neutral reasons. She

explained that her challenge of Smith was based on what she had anticipated to be defense counsel's strategy of attributing to the arresting officer's insistence the false name given by the defendant. She was concerned that defense counsel would try to attribute the confusion as to the defendant's identity to the police officers. Over the lunch break, however, she had spoken to the arresting officer and verified that it was the defendant, not the police officers, who had created the confusion as to the defendant's real name. Therefore, she was no longer as concerned as she had been with the venirepersons' prior experiences with police officers. The state's attorney also pointed out that, unlike Smith, Gallace had recounted some positive encounters with the police to offset the negative one he had described. The state agreed, however, to withdraw its peremptory challenge to Smith and to seat him on the jury.

Smith was by then unavailable, however, and could not be seated.[11] Defense counsel renewed his motion to dismiss the entire jury panel and to begin jury selection anew. The state's attorney reiterated her argument that there was no evidence that the distinction made by the state between Smith and Gallace was racially related, and that any distinction to be made had more to do "with the state's assessment of the credibility of an argument . . . on the alias issue" and that it had to do "with what I understood would be a defense argument and whether a juror would be particularly susceptible to that argument . . . it's certainly [still] a concern but not as much as it was earlier."

The court stated that dismissing the jury and beginning selection anew "would be the most cautious way to proceed in terms of appellate review," but that, hav-

---

[11] There is apparently a conflict, irrelevant to our analysis here, as to whether Smith was unavailable to serve on the jury because he had left the building or because he had been selected to sit on another jury.

ing observed both Smith and Gallace, "the reason proffered at the time by the state for the peremptory challenge made sense." Moreover, the court stated that the reasons given by the state subsequent to accepting Gallace, including the fact that Gallace had had positive experiences with police officers, did not show bad faith on the part of the state. The court also concluded that the state's willingness to seat Smith if he were still available evidenced the state's good faith. The court held, therefore, that the state's use of its peremptory challenge was not racially motivated and the reasons offered by the state for its exercise were valid and evidenced proper use of a peremptory challenge.[12] Counsel for both defendants took exception.

If the defendant is found to have sustained the burden of proof by a fair preponderance of the evidence that but for the prosecutor's invidious purpose, the juror would not have been challenged; *State* v. *Gonzalez*, supra, 206 Conn. 399–400; *State* v. *Holloway*, supra, 209 Conn. 644; "the trial court must then dismiss the jurors thus far selected and the remaining venire, and begin anew the jury selection process." *State* v. *Gonzalez*, supra, 400. If the defendant had met his burden of proof, the trial court should have dismissed the jurors

---

[12] The court stated that while beginning jury selection anew "might be the easier thing to do, I don't think it makes—makes sense. I don't think it's required by the law in this jurisdiction or under the United States Supreme Court decisions to strike the panel. Gallace was accepted after the excusal of Smith. There was only one juror. We still have only two jurors so I think the remedy would be extreme at this point. It would serve no purposeful end to strike those two jurors at this point. I think the fact that we cannot have Smith as a juror, while it might be unfortunate, it amounts to crying over spilled milk at this point. The reasons were valid at the time and the fact that the state wanted to withdraw that peremptory challenge, I think only tends to add to the good faith on the part of the state. So again, I don't think in terms of judicial economy, is it the right thing to do nor do I think there is any prejudice to the defendants based on this ruling. So that my—I will deny the renewed motion under *Batson* to strike the two jurors who have been selected."

already selected, as well as the remaining venire, and begun the jury selection process all over again. We conclude that here the trial court was correct in not doing so. We reach this conclusion because the defendant did not meet his burden of proof.

Before discussing whether the defendant failed to meet his burden of proof, we must discuss the fact that he is not of the same race as the challenged juror. *Batson* and its Connecticut progeny are based on the premise that the impermissible discriminatory purpose violates the equal protection clause when potential jurors who are of the same race as the criminal defendant are excluded from the jury. See *Batson* v. *Kentucky*, supra, 476 U.S. 79; *State* v. *Patterson*, 230 Conn. 385, 645 A.2d 535 (1994); *State* v. *Hinton*, 227 Conn. 301, 630 A.2d 593 (1993); *State* v. *Smith*, supra, 222 Conn. 1; *State* v. *Holloway*, supra, 209 Conn. 636; *State* v. *Gonzalez*, supra, 206 Conn. 391.

Although the reported Connecticut cases involving a *Batson* issue concern defendants and prospective jurors of the same race, it is now clear that a criminal defendant may object to racially based exclusions of jurors through peremptory challenges, both for himself and on behalf of a rejected juror, whether or not the excluded juror is of the same race. *Powers* v. *Ohio*, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991). *Powers* held that a white defendant could question the use of a peremptory challenge to excuse an African-American venireperson.[13] The defendant here, "as an Hispanic, was a member of a cognizable racial group";

[13] Whether *Powers* extends to the questioning by a black defendant of the use of a peremptory challenge when the venireperson is white and the venire is composed of a majority of whites or all whites, or extends to the questioning by a white defendant of a peremptory challenge of a white venireperson; *Powers* v. *Ohio*, supra, 499 U.S. 438 (Scalia, J., dissenting); is not clear. Also, it is not clear in the event of either of these situations, whether the abrogation of the first prong of *Batson* as provided in *State* v. *Holloway*, supra, 209 Conn. 636, would retain its applicability.

*State* v. *Gonzalez,* supra, 206 Conn. 396; and the excused juror, Smith, as an African-American is also a member of a cognizable racial group. *Batson* v. *Kentucky,* supra, 476 U.S. 79;[14] see also *State* v. *Patterson,* supra, 230 Conn. 385; *State* v. *Holloway,* supra, 209 Conn. 636.

A defendant may waive, expressly or impliedly, a right to make a *Batson* type claim, both for himself and for prospective jurors. *State* v. *Patterson,* supra, 230 Conn. 393–94. In this case, however, as in *Powers,* the defendant did not waive either right and expressly asserted both his own right to include Smith on the jury, and, by participating in the attempted recall of Smith, the right of Smith to participate in the trial process. Because this is so, *Batson* type principles are applicable to the testing of the use of a peremptory challenge to exclude Smith.

"[T]o rebut an inference of discrimination, a prosecutor must articulate a neutral explanation related to the particular case to be tried." *State* v. *Gonzalez,* supra, 206 Conn. 398 n.5. Here, in response to the defendant's initial *Batson* challenge, the state expressed concern that Smith's negative impression of a police officer might make Smith more sympathetic to the defendant's claim that the confusion over his identity the night of his arrest was the fault of the police officers. In response to the defendant's renewed *Batson* challenge, after the acceptance of Gallace, the state

---

[14] The application of *Powers* v. *Ohio,* supra, 499 U.S. 400, where either the challenged venireperson or the defendant is not a member of a racially cognizable group because either person is a combination of many racial strains is uncertain. Another problem in the application of *Powers* is the determination of the venireperson's race and how that might be established. For example, according to the United States 1990 Census of Population, "persons of Hispanic origin can be of any race." United States Department of Commerce, Economics and Statistics Administration, Bureau of the Census, 1990 Census of Population, "General Population Characteristics—United States," p. B-7.

reiterated its concern over Smith's ability to consider the testimony of the police witnesses neutrally, but stated that having since spoken to the arresting officer, the state was no longer as concerned about that possible prejudice. The state then offered another reason for accepting Gallace but excusing Smith, which was that Gallace, unlike Smith, had recounted some positive experiences with police officers, which the state believed would "offset" the negative experience he had described.

"Prosecutors commonly seek to exclude from juries all individuals, whatever their race, who have had negative encounters with the police because they fear that such people will be biased against the government." *State* v. *Smith,* supra, 222 Conn. 14. "[T]his concern constitutes a neutral ground for the state's exercise of a peremptory challenge to excuse a black venireperson." Id.

"The principles of *Batson* make clear that a true evaluation of a claim of purposeful racial discrimination cannot turn on a statistical comparison of the number of venirepersons of the defendant's race that the state accepts and the number it rejects. These figures are nonetheless relevant." *State* v. *Holloway,* supra, 209 Conn. 644; *State* v. *Smith,* supra, 222 Conn. 13. After *Powers* v. *Ohio,* supra, 499 U.S. 400, the only relevant statistical comparison may be the number of venirepersons who are in a racial minority contrasted with the number of venirepersons who are in the racial majority. The comparisons could involve different racial minorities and majorities depending upon the particular area of the country in which the jury selection occurs. The selected jury in this case included one "African-American" man and one "half Puerto Rican, half African-American" woman, and, therefore, the defendant cannot claim that the prosecution excused all the minority venirepersons.

"The purpose of requiring an articulation of neutral reasons is to dispel the inference of discrimination raised by the defendant's prima facie case. . . . [R]eliance on intuitive judgment or an affirmation of good faith is insufficient . . . ." *State* v. *Gonzalez*, supra, 206 Conn. 398. Here, however, by agreeing to accept Smith as a juror, the state did more than merely articulate its good faith. Where Smith was at the time, and the fact that, unknown to the court and the parties, it was impossible to seat him at that point, is irrelevant. The defendant's renewed *Batson* claim permitted "the trial court and the prosecutor to reconsider and perhaps change their courses of conduct while that [was] still possible." *State* v. *Patterson*, supra, 230 Conn. 392. The state did reconsider its peremptory challenge as to Smith and would have changed its course of conduct, had that been possible.

"Because the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact . . . that decision will turn on evaluation of credibility . . . [and] a trial court's determination that there has or has not been intentional discrimination is entitled to great deference." (Internal quotation marks omitted.) *State* v. *Hinton*, supra, 227 Conn. 323. The trial court's ruling in this case was not improper.

## II

### INTERNAL AFFAIRS FILES

Prior to trial, defense counsel, suspecting that several of the police officers whom the state intended to call as witnesses had been investigated by the internal affairs division (IAD) of the Bridgeport and Fairfield police departments, subpoenaed the IAD records of those officers. The records were examined in camera by the court. The court ruled that none of the records contained any information that could be used to

impeach any of the officers' testimony. The court placed the records under seal and filed them with the clerk for appellate review.

During trial, the defendant, notwithstanding the court's earlier ruling on the IAD files, moved for permission to cross-examine police witnesses concerning internal disciplinary actions in which they might have been targeted. The state objected and requested that the defense make an offer of proof. The court agreed that an offer of proof should be made because, in its review of the IAD files, it had found "nothing admissible which would go to credibility." The court asked defense counsel if he had any information from an independent source about the officers' misconduct. Defense counsel admitted that he had no such information but argued that he was entitled to cross-examine the witnesses on internal disciplinary action as part of the defendant's right to confrontation.[15] The court ruled that absent any showing or offer of proof as to specific instances and as to specific witnesses, no cross-examination on this matter would be allowed. The court informed defense counsel that if he made an offer of

---

[15] Defense counsel argued that "I don't purport to know anything more than you had in reviewing the files. But my experience with the Bridgeport police department has lead me to believe—to be less accepting of their representations either directly or indirectly that nothing exists. Therefore, I think the best person to ask to answers like this would be the officers of both departments. And I've not had any experience with Fairfield police department which would lead me to believe that they would be less than forthright in divulging all the information. Still, I'm leaving room for human error factor into the situation and I frankly don't think there's any need to do any kind of offer of proof on the matter because it either exists or it doesn't exist. And if it does not exist, then I assume that the officers' credibility in the eyes of the jury is that much more bolstered, quite frankly. Of course if it is not, then they get to draw the conclusion that I—if it relates to a matter of veracity or lack thereof, then they get accepted for that. But based upon my client's state constitutional right and his federal constitutional right to confront the witnesses, I think this particular form of examination, in front of the jury, would be acceptable and I would request permission to do so."

proof, the court would consider allowing the line of questioning. The defendant made no offer of proof, but took an exception to the court's ruling.

The defendant now argues that he was unable to lay a sufficient foundation because the trial court would not disclose the files to him, and he therefore did not know what was in them and could not make an offer of proof as to their relevancy. He asks this court to make a de novo review of the files in order to determine whether he had any right to their contents.

Generally, personnel files are exempt from disclosure as public records under General Statutes § 1-15 et seq., more commonly known as the Freedom of Information Act (act). *State* v. *Januszewski*, 182 Conn. 142, 171, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981). In enacting the act, the legislature sought to balance the public's right to know against private needs for confidentiality. Id.

In criminal cases, however, the defendant's request for disclosure implicates a more significant right, that of a criminal defendant to impeach the witnesses who testify against him. Id. It is this right of the defendant that is involved in determining whether the information in the IAD files, otherwise exempt under the act, should have been disclosed to the defendant by the court. Id. The competing interests of the witnesses in confidentiality and the defendant's right to confront the witnesses against him must be balanced. Id.

"The disclosure of such information must be carefully tailored to a legitimate and demonstrated need for such information in any given case. Where disclosure of the personnel file would place in the hands of a defendant irrelevant or personal and sensitive information concerning the witness, the file should not be disclosed. *No criminal defendant has the right to con-*

*duct a general 'fishing expedition' into the personnel records of a police officer."* (Emphasis added.) Id., 172. Routine access to personnel files is not to be had, and requests for information should be specific and should set forth the issue in the case to which the personnel information sought will relate. Id., 173. The trial court should make available to the defendant only information that it concludes is clearly material and relevant to the issue involved. Id.

Here, the court gave the defendant an opportunity to make an offer of proof. By not availing himself of this opportunity the defendant failed to provide a showing that the personnel files might contain any material relevant to the case or might contain any material useful for impeachment of a witness. In the absence of such a showing, the records need not be released to the defendant. *State* v. *Howard*, 221 Conn. 447, 460, 604 A.2d 1294 (1992); see also *State* v. *James*, 211 Conn. 555, 579, 560 A.2d 426 (1989). The broad nature of the defense's request to the trial court and to this court is tantamount to a "fishing expedition" of the type explicitly prohibited by *Januszewski.*

We, therefore, conclude that there was no abuse of discretion in the trial court's rulings, and that, on the facts of this case, we do not need to review the personnel files.

## III

### THE DEFENDANT'S PRIOR ARREST RECORD

After the Jimmy was seized, it was dusted by Detective Peter Bravo of the Fairfield police department for latent or visible fingerprints and other evidence. Bravo found seven partial latent fingerprints. Detective David Bensey of the Fairfield police department analyzed the latent prints found by Bravo, and compared them to ink prints taken from the defendant at the time of his arrest, but was unable to make a positive match.

The Fairfield police department gave the prints to Detective Eugene Redmond of the Bridgeport police department for comparisons with fingerprint cards in their files. Redmond was able positively to match the latent prints of the defendant, who had identified himself as Heriberto Rodriguez, with a card on file for Francisco Rodriguez, born November 22, 1957. The state elicited from Redmond that at the time of the defendant's arrest there were seven separate fingerprint cards for the defendant in the files of the Bridgeport police department because there were seven different "occasions" when the defendant's fingerprints were taken.

The state offered the cards as full exhibits. Defense counsel then asked to voir dire the witness, but did not ask that the jury be excused during the voir dire. He asked Redmond how many of the cards from the Bridgeport files he had actually used to make his identification of the defendant. The witness answered that he had actually used only one, "from a 1990 arrest." The defendant then asked that the jury be excused and requested a mistrial based on what he characterized as the state's misconduct in eliciting evidence of the seven prior "occasions" when fingerprints were taken.[16] The defendant argued that Redmond's testimony was the equivalent of introducing evidence of prior arrests, and also argued that there had been a motion in limine to exclude evidence concerning the defendant's prior arrest record. The state argued that it had not specifically identified the "seven different occasions" as arrests, and that it had mentioned the different "occasions" only to show that Redmond had a basis of comparison in making his identification of the defendant.

---

[16] Redmond explained to the court, after the request for a mistrial, that he had first compared the seven cards on file to each other, ascertained they were all from the same Francisco Rodriguez, and then compared one of those cards to the prints supplied by the Fairfield police department.

The court denied the defendant's motion for a mistrial and, at the defendant's request, allowed only one fingerprint card, redacted as to any reference to arrest, into evidence. The court gave a limited cautionary instruction to the jury, instructing that the admitted card was relevant only for the limited purpose of identification and that the jury should not speculate as to the reason why the fingerprints had been taken.[17] The defendant took an exception to the denial of his motion for a mistrial but did not take exception to the cautionary instruction.

The defendant argues that his request for a mistrial should have been granted and that even though only one fingerprint card was actually admitted into evidence, the state's reference to seven different "occasions" on which fingerprints were taken, together with Redmond's reference to a "1990 arrest" was in effect inadmissible character propensity evidence. The defendant contends that the state's line of questioning regarding the fingerprint cards constituted prose-

---

[17] The court told the jury: "In your absence, [this] fingerprint card was admitted into evidence as a full exhibit, but I want to give you a couple of instructions now. The other cards which were offered were not accepted into evidence and I'm going to ask you to disregard the cards. You didn't see the cards, but disregard all of the testimony concerning the other cards. And I want to give you an instruction concerning [this card] which I did admit into evidence. And again, that is the fingerprint card to which Detective Redmond has been testifying. And that's been admitted into evidence for a limited purpose and that is identification. You should not speculate as to the reason for the fingerprinting of Mr. Rodriguez. There are many reasons that individuals are fingerprinted and I'm sure many of you are aware of this. Fingerprints are taken for various civil service positions, various job applications, security clearances. There really are a number of reasons that police departments are called upon to take members of the community's fingerprints [which] are kept on file at the Bridgeport police department. Any time they're taken by the Bridgeport police department or any other police department, for any reason, that police department keeps a record of those prints on file. So don't speculate as to the reason here that the prints were taken originally. But again, the fingerprint card . . . is admitted for identification purposes."

cutorial misconduct and that he has, therefore, been deprived of a fair trial and due process under both the federal and state constitutions. The defendant concedes that the one card admitted was relevant to the issue of identity, but insists that he was nonetheless unfairly prejudiced by the earlier references to the seven separate cards. Finally, the defendant argues that the curative instruction given by the court was insufficient to repair the prejudice to him because the number of cards referred to made it impossible reasonably to believe that the jury followed the instruction and did not speculate as to why the prints had been taken.

The state counters that the state's attorney never used the word "arrest" when questioning Redmond, and that it was defense counsel, not the state's attorney, who elicited the word "arrest" from Redmond. The state also claims that the cards were introduced only to show surety of comparison, and that the defendant is the one who put his identity at issue by giving a false name at the scene of the arrest. The state also notes, as did the court in its curative instruction, that fingerprints are taken for purposes other than arrest.

"[E]vidence of criminal activities is generally inadmissible to prove the guilt of the defendant as to the crime charged. . . . Although such evidence may be admissible for other purposes, such as the impeachment of the defendant's credibility . . . the general rule excludes the evidence so as to avoid 'the danger of prejudice against the defendant which may result from the admission of such evidence.' " (Citations omitted.) *State* v. *Onofrio*, 179 Conn. 23, 28, 425 A.2d 560 (1979). Unless the defendant himself puts his character at issue, the prosecutor may not introduce evidence of the defendant's criminal record. *State* v. *McClendon*, 199 Conn. 5, 13, 505 A.2d 685 (1986); *State* v. *Ibraimov*, 187 Conn. 348, 352, 446 A.2d 382 (1982).

"Under the principles of real or demonstrative evidence, authenticated fingerprints may be introduced into evidence and compared with other fingerprints found at or near the scene of a crime." *State* v. *Ralls*, 167 Conn. 408, 417, 356 A.2d 147 (1974). "The admission of a fingerprint record containing extraneous material which in itself is incompetent, however, may constitute reversible error depending on whether the evidence of past crimes has been masked or obliterated . . . ." Id., 417–18. "Whenever a fingerprint card is introduced as evidence . . . an implication of criminal history potentially arises which, of course, should be dispelled. . . . [T]he better practice is to cover every questionable element of the card, including dates and other printed matter." Id., 418–19.

Where, however, the jury is "at most . . . exposed to an implication of arrest without any indication of conviction, which was dispelled by the court's cautionary instructions as to the limited purpose for which the fingerprint card was offered and as to the possibility that the prints were taken for a purpose unrelated to crime, such as employment" there is insufficient ground for a mistrial. Id. "[A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated." *State* v. *Wooten*, 227 Conn. 677, 693, 631 A.2d 271 (1993). "A determination of whether a mistrial is warranted is left to the sound judgment and discretion of the trial judge." Id. Finally, the trial court has the discretion to determine that the probative value of a fingerprint card outweighs its prejudicial effect. *State* v. *Baker*, 182 Conn. 52, 59, 437 A.2d 843 (1980).

There was no abuse of discretion by the trial court in admitting the redacted fingerprint card, which was clearly relevant to the issue of identity, as even the

defendant concedes. Moreover, any prejudice to the defendant resulting from the reference by the state's attorney to the seven other "occasions" where finger-prints had been taken, or the reference by Redmond to the defendant's 1990 arrest in response to a ques-tion by the defendant, was cured by the trial court's instruction, to which the defendant took no exception. " 'If curative action can obviate the prejudice, the dras-tic remedy of a mistrial should be avoided.' " *State* v. *Wooten*, supra, 227 Conn. 694. The defendant, there-fore, cannot prevail on this claim.

The defendant claims that the state's attorney's actions amounted to "prosecutorial misconduct." A "demonstrated deliberate effort by a prosecutor to influence the jury against the defendant through the attempted introduction of obviously inadmissible evi-dence may entitle the defendant to a new trial." *State* v. *Baker*, supra, 182 Conn. 58. The defendant, however, has not shown any "demonstrated deliberate effort" by the state's attorney. We conclude there was no impropriety in the state's attorney's efforts to estab-lish the identity of the defendant.

## IV

### THE CHARGE ON REASONABLE DOUBT

The defendant's final claim relates to the instruction given on the reasonable doubt standard. The defend-ant took no exception to the instruction given.[18] In fact, the instruction given is virtually identical to the one offered by the defendant in his request to charge. In his request to charge, the defendant asked for the fol-lowing instruction: "It is not required that the prose-cution prove guilt beyond all possible doubt. The test is one of reasonable doubt. A reasonable doubt is a

---

[18] The defendant did, however, take exception to other portions of the charge, none of which he has challenged on appeal.

doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act. *Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in his or her most important affairs."* (Emphasis added.)

The instruction actually given by the court included the following: "A reasonable doubt is a doubt founded upon reason and common sense and not on the mere possibility of innocence. As the words imply, it is a doubt held by a reasonable person after all the evidence in the case is carefully analyzed, compared and weighed . . . . The state does not have to prove guilt beyond all doubt or to a mathematical or an absolute certainty. A reasonable doubt may arise not only from the evidence produced, but also from a lack of evidence, since the burden is upon the state to prove a defendant guilty beyond a reasonable doubt of every essential element of each crime charged . . . . *Reasonable doubt is the kind of a doubt upon which reasonable persons like yourselves in the more serious and important affairs in your own lives would hesitate to act."* (Emphasis added.)

The defendant claims that the charge given diluted the state's burden of proof and deprived the defendant of a fair trial and due process of law under the fifth, sixth, and fourteenth amendments to the United States constitution, and article first, § 8, of the Connecticut constitution. The defendant does not articulate precisely how the state's burden of proof was diluted by the given charge, and admits he did not except to the charge when it was given. Presumably, the defendant seeks review under *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989), although he has not cited that case, which allows review of an unpreserved claim of constitutional error under certain conditions. The

claim is reviewable under the first two prongs of *Golding*, but the actual review shows the defendant's claim to be meritless.

With regard to jury instructions on the reasonable doubt standard, the United States Supreme Court has held that "so long as the court instructs the jury on the necessity that the defendant's guilt be proven beyond a reasonable doubt . . . the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. . . . Rather, taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury." (Internal quotation marks omitted.) *Victor* v. *Nebraska*, U.S. , 114 S. Ct. 1239, 1243, 127 L. Ed. 2d 589 (1994); see also *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).

The sole authority presented by the defendant to support his argument that the "hesitate to act" formulation used in the charge in his case is unconstitutional is a critique of the formulation by a committee of federal judges, cited by Justice Ginsberg in her concurring opinion in *Victor*. She stated that " 'the analogy . . . seems misplaced. In decisions people make in the most important of their own affairs, resolution of conflicts about past events does not usually play a major role. Indeed, decisions we make in the most important affairs of our lives—choosing a spouse, a job, a place to live, and the like—generally involve a very heavy element of uncertainty and risk-taking. They are wholly unlike the decisions jurors ought to make in criminal cases.' " *Victor* v. *Nebraska*, supra, 114 S. Ct. 1252.

The defendant fails, however, to take note that while in her concurrence to *Victor,* Justice Ginsberg favors a different formulation of the reasonable doubt standard, she agrees that the "hesitate to act" formulation does pass muster under the *Winship* standard. Id.,

1253–54. The defendant also relies on a case from the District of Columbia federal circuit court critiquing the "hesitate to act" formulation, but overlooks the line of Connecticut cases upholding that and similar formulations. *State* v. *Gomez*, 225 Conn. 347, 353 n.8, 622 A.2d 1014 (1993); *State* v. *Thomas*, 214 Conn. 118, 118–19, 570 A.2d 1123 (1990); *State* v. *Smith*, 210 Conn. 132, 147–50, 554 A.2d 713 (1989).

Those cases, both federal and state, hold that the "hesitate to act" formulation and formulations similar to it do not decrease the state's burden of proof. The defendant is in the untenable position of asking this court to overrule both the United States and the Connecticut Supreme Courts.

We find neither a clear violation of a fundamental constitutional right nor a deprivation of a fair trial, and, therefore, the defendant's unpreserved claim does not satisfy all of the conditions of *Golding*.

The judgment is affirmed.

In this opinion the other judges concurred.